Slip Op. 14-120

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| JMC STEEL GROUP,<br><br>    Plaintiff,<br><br>ALLIED TUBE AND CONDUIT,<br>WHEATLAND TUBE, AND UNITED<br>STATES STEEL CORPORATION,<br><br>    Plaintiff-Intervenors,<br><br>v.<br><br>UNITED STATES,<br><br>    Defendant,<br><br>AL JAZEERA STEEL PRODUCTS CO.,<br>SOAG, VIETNAM HAIPHONG<br>HONGYUAN MACHINERY<br>MANUFACTORY CO., LTD.,<br>UNIVERSAL TUBE AND PLASTIC<br>INDUSTRIES, LTD., KHK<br>SCAFFOLDING & FORMWORK, LLC,<br>UNIVERSAL TUBE AND PIPE<br>INDUSTRIES, LLC, ZENITH BIRLA<br>(INDIA) LIMITED, AND CONARES<br>METAL SUPPLY LIMITED,<br><br>    Defendant-Intervenors. | **Public Version**<br>Before: Mark A. Barnett, Judge<br>Court No. 13-00022 |

<u>OPINION</u>

[The court grants in part and denies in part Plaintiff's and Plaintiff-Intervenors' Motions for Judgment on the Agency Record and remands the determination to the International Trade Commission.  On remand, the ITC shall reconsider Plaintiff's argument that the structure of the domestic CWP market precluded domestic producers from providing the ITC the lost sales and revenue information which it sought.  The ITC also shall further examine the impact of subject imports on the domestic industry within the context of the business cycle.  The Commission may collect additional evidence relevant to these

issues and reconsider any aspect of the *Final Determination* which relied upon or took into consideration its prior findings on these issues.]

Dated: October 15, 2014

*John R. Magnus*, Tradewins LLC, of Washington, DC, for plaintiff.

*Roger B. Schagrin*, Schagrin Associates, of Washington, DC, argued for plaintiff-intervenor Allied Tube and Conduit.  With him on the brief was *John W. Bohn*.

*Stephen P. Vaughn*, *Robert E. Lighthizer*, *James C. Hecht*, and *Luke A. Meisner*, Skadden, Arps, Slate, Meagher & Flom LLP, of Washington, DC, for plaintiff-intervenor United States Steel Corporation.

*Gilbert B. Kaplan*, King & Spalding, LLP, of Washington, DC, argued for plaintiff-intervenor Wheatland Tube.

*Karl von Schriltz*, Attorney, Office of the General Counsel, U.S. International Trade Commission, of Washington, DC, argued for defendant.  With him on the brief were *Dominic L. Bianchi*, General Counsel, and *Neal J. Reynolds*, Assistant General Counsel for Litigation.

*David L. Simon*, Law offices of David L. Simon, of Washington, DC, for defendant-intervenor Al Jazeera Steel Products Co., SAOG.

*Donald B. Cameron*, Morris, Manning & Martin LLP, of Washington DC, argued for defendant-intervenors Universal Tube and Plastic Industries, KHK Scaffolding & Formwork, LLC, and Universal Tube and Pipe Industries, LLC.  With him on the brief were *Julie C. Mendoza*, *R. Will Planert*, *Brady W. Mills*, *Mary S. Hodgins*, and *Sarah S. Sprinkle*.

*Max F. Schutzman*, *Ned. H. Marshak*, and *Kavita Mohan*, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of New York, NY, for defendant-intervenors Zenith Birla (India) Ltd. and Conares Metal Supply Ltd.

*Robert F. Gosselink* and *Jonathan M. Freed*, Trade Pacific PLLC, of Washington DC, for defendant-intervenor Vietnam Haiphong Hongyuan Machinery Manufactory Co., Ltd.

Barnett, Judge:  Plaintiff JMC Steel Group ("JMC") and Plaintiff-Intervenors Allied

Tube and Conduit ("Allied"), United States Steel Corporation ("U.S. Steel") and

Wheatland Tube ("Wheatland") (collectively, "Plaintiffs") move, pursuant to USCIT Rule

56.2, for judgment on the agency record, challenging the United States International

Trade Commission's ("ITC" or "Commission") negative final injury determinations in the

antidumping and countervailing duty investigations concerning certain circular welded

carbon-quality steel pipe ("CWP") from India, Oman, the United Arab Emirates ("UAE"),

and Vietnam ("subject imports"), published in *Circular Welded Carbon-Quality Steel*

*Pipe from India, Oman, the United Arab Emirates, and Vietnam*, 77 Fed. Reg. 73,674

(ITC Dec. 11, 2012) ("*Final Determination*"), and the accompanying *Views of the*

*Commission*, USITC Pub. 4362, Inv. Nos. 701-TA-482-484 and 731-TA-1191-1194

(Final) (Dec. 2012) ("*Views*").[1]  For the reasons stated below, the court grants in part

and denies in part Plaintiff's and Plaintiff-Intervenors' motions and remands this case to

the ITC.

## BACKGROUND

On October 26, 2011, Plaintiffs filed a petition with the ITC, alleging material

injury and threat of material injury by reason of dumped and subsidized CWP imports

from India, Oman, the UAE, and Vietnam.  *See Circular Welded Carbon-Quality Steel*

*Pipe from India, Oman, United Arab Emirates, and Vietnam*, 76 Fed. Reg. 68,208 (ITC

Nov. 3, 2011) (initiation of antidumping and countervailing duty investigations).  In

December 2012, the ITC published its final determination, which examined a period of

---

[1] All citations to the *Views of the Commission* and to the agency record are to their
confidential versions.

investigation ("POI") of January 2009 through June 2012.  The Commission described

CWP as:

> [s]tandard pipe . . . . intended for the low-pressure conveyance of water,
> steam, natural gas, air, and other liquids and gases in plumbing and heating
> systems, air conditioning units, automatic sprinkler systems, and other
> related uses. . . .
>       Other applications for CWP include light load-bearing or mechanical
> applications, such as conduit shells, and structural applications in general
> construction.

*Views* at 9 (footnotes omitted).[2]  The Commission determined that subject imports and

the domestic like product are "generally fungible," share the same channels of

distribution, have a "reasonable overlap" of competition, and that price is a significant

factor in CWP purchasing decisions.  *Id.* at 15-16, 20.  It found a significant increase in

the volume of subject imports during the POI, in absolute terms and relative to domestic

consumption and production, but concluded that the increase did not have significant

adverse effects on the domestic industry.  *Id.* at 29.  Although the ITC observed that

subject imports "pervasively undersold" the domestic like product by significant margins

during the POI, it nevertheless found "no evidence" that subject imports significantly

depressed or suppressed prices of the domestic like product.  *Id.* at 30-31.  The ITC

also found that the domestic industry's performance improved in "almost every measure

[during the POI] despite the weak recovery in CWP demand" following the 2008

economic crisis and that there was no correlation between subject import volume,

---

[2] The complete descriptions of the domestic like product and the formal scope language
involve long, technical descriptions of the subject pipe which is not at issue in this
litigation.  In lieu of that language, this abbreviated description is provided for brevity
and convenience.

market share, and underselling, and domestic industry performance.  *Id.* at 43.  In a 4-2

vote, the Commission determined that cumulated imports of dumped and subsidized

subject imports from India, Oman, and the UAE and dumped subject imports from

Vietnam neither caused nor threatened to cause material injury to the domestic industry.

*Final Determination*, 77 Fed. Reg. at 73,675; *accord Views* at 50.

      Plaintiffs now challenge the *Final Determination* on several grounds.  (*See*

*generally* Br. JMC in Supp. Mot. J.A.R. ("JMC Mot."); Mem. in Supp. Mot. J.A.R. of

Allied ("Allied Mot."); Mem. in Supp. Mot. Pl. U.S. Steel J.A.R. ("U.S. Steel Mot."); Br.

Wheatland in Supp. Mot. J.A.R. ("Wheatland Mot.").)  Plaintiffs variously contest, as

unsupported by substantial evidence or not in accordance with law, the ITC's findings

that (1) there was no correlation between the increase in subject import volume and

negative price effects; (2) there was no correlation between the increase in subject

import volume and declines in the domestic industry's performance; (3) the closure of

two domestic CWP mills did not occur due to subject imports and led to increased

capacity at other mills; (4) subject producer capacity did not threaten the domestic

industry with material injury; and (5) the domestic industry did not anticipate negative

effects from subject imports in the imminent future.  They also contest the lawfulness of

the ITC's (1) alleged conclusion that negative volume effects alone could not warrant an

affirmative injury determination; (2) alleged failure to take into account the business

cycle in its analysis; (3) use of pre-POI data in its analysis; (4) refusal to employ the

Commercial Policy Analysis System methodology ("COMPAS model"); and (5) reliance

on interim 2011 and 2012 data.  The Court has subject matter jurisdiction pursuant to 28

U.S.C. § 1581(c).

STANDARD OF REVIEW

The court will uphold an agency determination that is supported by substantial

evidence and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).

Substantial evidence is "'such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'"  *Huaiyin Foreign Trade Corp. (30) v. United States*,

322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S.

197, 229 (1938)).  It '"requires more than a mere scintilla," but "'less than the weight of

the evidence.'"  *Nucor Corp. v. United States*, 34 CIT __, __, 675 F. Supp. 2d 1340,

1345 (2010) (quoting *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004)).

In determining whether substantial evidence supports the ITC's determination, the court

must consider "the record as a whole, including evidence that supports as well as

evidence that 'fairly detracts from the substantiality of the evidence.'"  *Nippon Steel*

*Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (quoting *Atl. Sugar, Ltd. v.*

*United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).  That a plaintiff can point to

evidence that detracts from the agency's conclusion or that there is a possibility of

drawing two inconsistent conclusions from the evidence does not preclude the agency's

finding from being supported by substantial evidence.  *Matsushita Elec. Indus. Co. v.*

*United States*, 750 F.2d 927, 933, 936 (Fed. Cir. 1984) (citing *Consolo v. Fed. Mar.*

*Comm'n*, 383 U.S. 607, 619-20 (1966); *Armstrong Bros. Tool Co. v. United States*, 626

F.2d 168, 170 n.3 (C.C.P.A. 1980)).  The court "may not reweigh the evidence or

substitute its own judgment for that of the agency."  *Usinor v. United States*, 28 CIT

1107, 1111, 342 F. Supp. 2d 1267, 1272 (2004) (citation omitted).

Separately, the two-step framework provided in *Chevron, U.S.A., Inc. v. Natural

Resources Defense Council, Inc.*, 467 U.S. 837, 842-45 (1984), governs judicial review

of the Commission's interpretation of the antidumping and countervailing duty statutes.

*See Nucor Corp. v. United States*, 414 F.3d 1331, 1336 (Fed. Cir. 2005).  First, the

court must determine "'whether Congress has directly spoken to the precise question at

issue.'"  *Heino v. Shinseki*, 683 F.3d 1372, 1377 (Fed. Cir. 2012) (quoting *Chevron*, 467

U.S. at 842).  If Congress's intent is clear, "'that is the end of the matter.'"  *Id.* (quoting

*Chevron*, 467 U.S. at 842-43).  However, "[i]f the statute is silent or ambiguous," the

court must determine "whether the agency's action is based on a permissible

construction of the statute."  *Dominion Res., Inc. v. United States*, 681 F.3d 1313, 1317

(Fed. Cir. 2012) (citing *Chevron*, 467 U.S. at 842-43).

### DISCUSSION

Two separate, but parallel, provisions of the Tariff Act of 1930, as amended,

provide for the ITC to determine whether a domestic industry is materially injured, or

threatened with material injury, by reason of unfairly subsidized or dumped imports.

*See* 19 U.S.C. §§ 1671d(b), 1673d(b).  The Commission will issue an affirmative

determination if it finds "present material injury or a threat thereof" and makes a "finding

of causation."  *Hynix Semiconductor, Inc. v. United States*, 30 CIT 1208, 1210, 431 F.

Supp. 2d 1302, 1306 (2006) (citation and quotation marks omitted).  In making a

material injury determination, the Commission evaluates "(1) the volume of subject

imports; (2) the price effects of subject imports on domestic like products; and (3) the

impact of subject imports on the domestic producers of domestic like products." *Id.*

(citing 19 U.S.C. § 1677(7)(B)(i)(I)-(III)); *accord GEO Specialty Chems., Inc. v. United*

*States*, Slip Op. 09-13, 2009 WL 424468, at *2 (CIT Feb. 19, 2009).  The Commission

may also consider "'such other economic factors as are relevant in the determination.'"

*Hynix Semiconductor*, 30 CIT at 1210, 431 F. Supp. 2d at 1306 (quoting 19 U.S.C

§ 1677(7)(B)(ii)).

### I.  Volume

In performing its volume analysis, the ITC must "'consider whether the volume of

imports of the merchandise, or any increase in that volume, either in absolute terms or

relative to production or consumption in the United States, is significant.'"  *Shandong*

*TTCA Biochemistry Co. v. United States*, 35 CIT __, __, 774 F. Supp. 2d 1317, 1322

(2011) (quoting 19 U.S.C. § 1677(7)(C)(i)).

In its *Views*, the ITC found that the volume of cumulated subject imports grew

significantly during the POI, both in absolute terms and relative to apparent domestic

consumption and production.[3]  *Views* at 27.  However, the ITC found that the increased

---

[3] Pursuant to 19 U.S.C. § 1677(7)(I), the Commission recognized that the petition filings in this case, as well as "the substantial provisional antidumping and countervailing duty margins" imposed on subject imports from India, partially caused a 28.1 percent decline in subject import volume and a 4.7 point drop in subject import market share between the first halves of 2011 and 2012, primarily because subject imports from India collapsed by 90.9 percent.  *Views* at 27 n.127 (citing *Staff Report* at Tables IV-2, IV-10, C-1).  Non-subject imports, rather than the domestic industry, gained this vacated market share.  The domestic industry's market share fell from 63.8 percent to 62.7

imports did not cause significant adverse effects to the domestic industry for several reasons.  *Id.* at 28.  In part, the Commission found that the 20.0 percent increase in apparent domestic consumption of CWP between 2009 and 2011 permitted the domestic industry to increase domestic shipments by 10.2 percent during the same period, despite the simultaneous increase in subject imports.  *Id.* (citing *Staff Report* at Table IV-9).

Most of the arguments that Plaintiffs characterize in their briefs as concerning volume are, in fact, rooted in disagreements over subject imports' impact on the domestic industry.  The court therefore will address those issues in the impact section, *infra*.  Apart from one legal argument by JMC, there is no dispute over the Commission's volume findings.

### A.  The ITC Did Not Assume that Negative Volume Effects Alone Cannot Warrant an Affirmative Injury Determination

#### 1.  Contentions

JMC argues that the Commission unlawfully based its negative material injury determination on the incorrect premise that volume effects alone cannot lead to an affirmative injury determination.  It asks the court to remand and order the Commission to explain whether it interprets the statutory scheme to permit an affirmative injury determination based solely on negative volume effects.  (JMC Mot. 13 & nn.6-7.)

---

percent during the period, while non-subject imports' market share rose from 21.5 percent to 27.3 percent.  *Id.* (citing *Staff Report* at Table IV-10).

## 2.  Analysis

In its *Views*, the Commission found a significant increase in subject import volume and market share, and concluded that the increases did not have significant adverse impacts on the domestic industry because (1) the domestic industry increased its U.S. shipments by 10.2 percent during the POI; (2) the domestic industry's market share from 2009 through 2011 exceeded that of any year between 2000 and 2008; and (3) the increase in subject import volume and market share did not coincide with significant adverse price effects or other adverse impacts on the domestic industry. *Views* at 28-29.  Nowhere in its *Views* did the Commission indicate that volume effects could not independently warrant an affirmative injury determination, and JMC does not identify any place in the record where the ITC made such an assumption.  Moreover, the fact that the ITC found a significant increase in subject import volume and market share does not compel an affirmative injury determination.  The language of the statute is clear that "[t]he presence or absence of any factor which the Commission is required to evaluate . . . shall not necessarily give decisive guidance with respect to the determination by the Commission of material injury."  19 U.S.C. § 1677(7)(E)(ii).

JMC's request for a remand for the Commission to state whether a particular factual scenario could, by itself, support an injury determination must be rejected.  The court will only decide the case before it, without requiring the agency to render any hypothetical or advisory opinions.  JMC has failed to identify any legal error in the

Commission's consideration of volume.  Consequently, the court denies JMC's request to remand the ITC's determination for any further consideration of the legal standard applicable to the agency's volume analysis.

## II.  Price Effects

To determine the effects of subject imports on U.S. prices of the domestic like product, the Commission inquires:  (1) whether there has been "significant price underselling by the imported merchandise as compared with the price of domestic like products" and (2) whether "the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree."  19 U.S.C. § 1677(7)(C)(ii)(I)-(II); *accord Shandong TTCA Biochemistry*, 35 CIT at __, 774 F. Supp. 2d at 1326.

In the present case, the ITC employed a correlation analysis to discern the price effects of subject imports.  After discussing the fungibility of subject imports and the domestic like product, and the importance of price in CWP purchasing decisions, the Commission examined whether the underselling margins of subject imports led to negative price effects on the domestic like product.  *Views* at 30-31.  The ITC first turned to average quarterly net U.S. f.o.b. price data, from eleven U.S. producers and twenty-eight importers.  *Id.* at 30 (citing *Staff Report* at V-4).  After determining the quarterly price averages, the ITC found an average underselling margin for each quarter for each of four selected products.  *Id.* (citing *Staff Report* at Table V-6).  Examining these quarterly underselling margins, the ITC found that subject imports "pervasively"

undersold the domestic like product by significant margins throughout the POI – e.g., in 165 of 191 quarterly comparisons, or 86 percent of the time, at margins ranging from 1.0 to 50.4 percent.  *Id*. (citing *Staff Report* at Table V-6).

The ITC concluded, however, that subject imports did not significantly depress prices of the domestic like product, "because U.S. producer prices for sales of three of the four pricing products were higher in the second quarter of 2012 than in the first quarter of 2009."  *Id.* (citing *Staff Report* at Table V-5).  It also observed no evidence of significant price suppression, "because domestic producers were able to pass higher costs on to purchasers," as demonstrated by improvements in the domestic industry's ratio of cost of goods sold ("COGS") to net sales and the increase in the margin between the domestic industry's raw material costs per unit and net sales value per unit (the "metal margin").  *Id*. at 31-32 (citing *Staff Report* at Table VI-1).  The Commission did not find compelling Allied and Wheatland's claims that they could not fully realize several announced price increases in late 2010 and 2011, reflecting increasing raw material costs, and even experienced some price declines.  *Id*. at 31 (citing Allied's Prehr'g Br. 15-16).  The ITC further noted an absence of confirmed allegations of lost sales and lost revenue.  *Id*. at 32-33 (citing *Staff Report* at V-20-21, Table V-7).  From these findings, the ITC concluded that while subject imports significantly undersold the domestic like product, they did not depress or suppress the prices of domestic like product during the period of investigation.  *Id*. at 33.

### A.  The ITC Reasonably Used a Price Correlation Analysis

#### 1.  Contentions

JMC, Allied, and Wheatland argue that the ITC should have considered the COMPAS methodology in its assessment of the domestic industry's performance because it better accounts for the impact of subject imports in the context of the business cycle than the price correlation analysis that the agency employed.  (JMC Mot. 29-30, 32-33; Allied Mot. 15-17; Wheatland Mot. 8.)  They describe the correlation analysis as "inadequate," because it "ignor[es] the interaction of the supply and demand functions of domestic, subject and nonsubject imports . . . and their determinants," rendering its results meaningless.  (JMC Mot. 32 n.24 (citation and quotation marks omitted); *see* Allied Mot. 10-11, 14-17; Wheatland Mot. 8.)

#### 2.  The Legal Standard for Challenges to the ITC's Choice of Methodology

When evaluating challenges to the ITC's choice of methodology, the court will affirm the chosen methodology as long as it is reasonable.  *Shandong TTCA Biochemistry Co.*, 35 CIT at __, 774 F. Supp. 2d at 1327 (citing *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1361-62 (Fed. Cir. 1996)); *accord Hynix Semiconductor, Inc.*, 30 CIT at 1210, 1215, 431 F. Supp. 2d at 1306, 1310-11.  When presented with a challenge to the Commission's methodology, the court examines "not what methodology [Plaintiff] would prefer, but . . . whether the methodology actually used by the Commission was reasonable."  *Shandong TTCA Biochemistry Co.*, 35 CIT at __, 774 F. Supp. 2d at 1329 (citation omitted).

### 3.  Analysis

JMC, Allied, and Wheatland have not demonstrated that the correlation analysis used to assess the effects of subject imports on the domestic industry's performance was unreasonable.  A correlation analysis entails tracking subject import trends in relation to trends in the domestic industry's performance, *see Altx, Inc. v. United States*, 26 CIT 709, 729 (2002), and the court has approved its use to assess the price effects of subject imports.  *See, e.g.*, *Comm. for Fair Coke Trade v. United States*, 28 CIT 1140, 1168 (2004) (affirming use of correlation analysis to determine whether subject import volumes caused injury to domestic industry); *Altx, Inc.*, 26 CIT at 726-29 (affirming use of correlation analysis to evaluate relationship between increased subject import volume and injury to domestic industry).  As explained above, it is not enough for Plaintiffs simply to proffer an alternate methodology, even if that alternate methodology is reasonable and not inconsistent with the statute.  Plaintiffs must demonstrate that the ITC could not properly rely on its selected methodology, something they have failed to do.  In the absence of any error in the Commission's analysis, the court will not disturb the ITC's use of a price correlation analysis in its determination.  *See also Altx, Inc.*, 370 F.3d at 1121 (holding that ITC is not required to use COMPAS model).[4]

---

[4] In the course of further examining the impact of subject imports within the context of the business cycle on remand, it is within the discretion of the Commission to determine whether to conduct any further examination of the COMPAS model.

### B. Substantial Evidence Supports the ITC's Finding of No Correlation Between Subject Imports and Domestic Prices

#### 1. Contentions

JMC asserts that record evidence indicates a correlation between subject import volume and price depression and suppression.  (JMC Mot. 24.)  It notes that in 2011, the volume of subject imports increased to 206,024 short tons – its highest level during the POI – and subject import market share rose to 13.9 percent.  (JMC Mot. 24.)  At the same time, U.S. prices fell for all four pricing products, from the second quarter to the third quarter of 2011, despite increasing demand.  (JMC Mot. 24.)   According to JMC, these events show that subject imports depressed domestic prices.  (JMC Mot. 24.)  JMC, Wheatland, and Allied also argue that the ITC's correlation analysis failed to account for the fungibility and high price sensitivity of CWP in its price effects analysis. (Wheatland Mot. 9, 12; Allied Mot. 6-7; *see* JMC Mot. 25-26; Allied Mot. 9.)  "If the supply of a commodity [such as CWP] increases, this will tend to cause prices to be lower than they otherwise would; and similarly, if new suppliers enter a market at a lower price, they will tend to cause the market price to decline."  (Allied Mot. 6-7; *accord* JMC Mot. 23; Allied Mot. 9.)

Additionally, JMC and Wheatland contend that the fluctuation of the domestic industry's operating margin and the domestic industry's cost-price squeeze in 2010-2011 demonstrated the presence of price suppression.  (Wheatland Mot. 13; JMC Mot. 24-25.)  For example, the domestic industry's operating margin fell from 16.2 percent in 2009 to 2.3 percent in 2011.  By comparison, in 2007, when the domestic market

absorbed 700,000 tons of unfairly traded imports from China, the domestic industry's

operating margin reached a nadir of only 3.3 percent.  According to JMC and

Wheatland, the domestic industry's performance could not have collapsed to such a

level in 2011 without suffering negative price effects caused by subject imports.

(Wheatland Mot. 13; JMC Mot. 25.)  Similarly, JMC avers that the inelasticity of

domestic CWP demand and the growth of U.S. consumption from 2010 to 2011 should

have enabled the domestic industry to increase prices sufficiently to stabilize, or at least

reduce, its COGS-to-net sales ratio.  (JMC Mot. 24.)  However, the ratio increased from

2010 to 2011, demonstrating the presence of negative price effects from subject

imports.  (JMC Mot. 24.)[5]

## 2.  Analysis

The ITC supported, with substantial evidence, its finding that there was no

correlation between the increase in volume of subject imports and any negative price

effects on the domestic like product.  The ITC used its standard correlation analysis to

examine the record for evidence of price depression, price suppression, and any link

---

[5] In its brief, Allied notes that the Commission previously has found increased CWP imports to suppress or likely to suppress domestic prices and argues that these determinations compel a similar result here.  (Allied Mot. 7 (citing *Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey*, USCIT Pub. 4333, at 14 (June 2012) (Third Review); *Circular Welded Carbon-Quality Steel Pipe from China*, Inv. Nos. 701-TA-447 & 731-TA-1116, USCIT Pub. 4019, at 15-18 (July 2008) (Final)).)  Because each determination is *sui generis*, previous negative price effects findings from CWP imports by the ITC, particularly in the sunset review context, as discussed *infra*, do not bind the present investigation.  *Comm. for Fair Beam Imps. v. United States*, 27 CIT 932, 944 (2003), *aff'd* 95 F. App'x 347 (Fed. Cir. 2004).

between subject imports and domestic prices.  *See, e.g.*, *Am. Bearing Mfrs. Ass'n v. United States*, 28 CIT 1698, 1709-17, 350 F. Supp. 2d 1100, 1112-19 (2004) (affirming ITC's use of correlation analysis to examine price effects).

In its price depression analysis, the ITC first turned to four pricing products and found that domestic producer prices for three of them increased during the POI.  *Views* at 30 (citing *Staff Report* at Table V-5).  Although the Commission recognized that domestic prices for Products 3 and 4 declined between the first quarter of 2009 and the last quarter of 2011,[6] it reasoned that the declines did not denote significant price depression because (1) the prices for Product 3 dropped only 5.2 percent, and those for Product 4 by only 1.5 percent, *id.* at 30 n.141 (citing *Staff Report* at Tables V-1-4), and (2) domestic price movements exhibited no relationship to subject import volume trends, *id.* at 30-31 (citing *Staff Report* at Tables IV-10, C-1).  For example, the average unit value of the domestic industry's U.S. shipments rose 20.0 percent from 2009 through 2011, from $898 per short ton in 2009, to $978 per short ton in 2010, and $1,078 per short ton in 2011, even as subject import volume and market share increased.  *Id.* (citing *Staff Report* at Table C-1).  Conversely, the ITC found that the average unit value of the domestic industry's domestic shipments fell from the first half of 2011 to the first half of 2012, from $1,099 per short ton to $1,054 per short ton, although subject import volume and market share also fell "substantially" during the same period.  *Id.* at 31

---

[6] A rise in the domestic producer prices for Product 3 between the last quarter of 2011 and the second quarter of 2012 left the domestic producer prices for Product 3 overall higher over the course of the POI.  *See Staff Report* at Table V-3.

(citing *Staff Report* at Tables IV-10, C-1).  The fact that Plaintiffs can point to a

correlation in domestic price movements in two select quarters of the POI does not call

into question the ITC's analysis of the record covering the POI as a whole.

 The Commission likewise found that higher volumes of subject imports did not

suppress prices of the domestic like product, because domestic producers were able to

pass higher costs on to their purchasers during the POI, as evidenced by the change in

the domestic industry's ratio of COGS to net sales and the so-called metal margin.  *Id.*

at 31-32.  The Commission found that the domestic industry's ratio of COGS to net

sales improved from 105.1 percent in 2009 to 89.1 percent in 2011, a period during

which subject import volume and market share increased.  *Id.* at 31 (citing *Staff Report*

at Table VI-1).  Similarly, the ITC noted that from interim 2011 to interim 2012, the

COGS ratio worsened from 83.5 percent to 88.7 percent, despite significantly lower

subject import volume and market share.  *Id.*  Likewise, over the course of the POI, the

domestic industry's metal margin (the difference between the CWP price and the cost of

the metal input) increased from $205 in 2009, to $301 in 2010, $306 in 2011, and $308

in 2012.  *Id.* at 32 & n.154 (citing CR *Staff Report* at Table VI-1, Figure V-3).  Similarly,

during a period of increased subject imports and subject import market share, the

domestic industry's ratio of raw material costs to net sales improved, from 78.5 percent

in 2009 to 71.2 percent in 2011.  *Id.* at 32 (citing *Staff Report* at Table VI-1).  On the

basis of this evidence, the ITC concluded that the domestic industry's ability to raise

 CWP prices to compensate for increased hot-rolled steel and zinc costs, which comprised approximately three-quarters of production costs, undermined the case for subject imports' causing significant price suppression.

        The court rejects JMC, Wheatland, and Allied's argument for a *per se* rule that a growing volume of subject imports which undersell the domestic like product, in the context of a highly competitive market for a fungible good, necessarily must produce negative price effects. [7]  The court has repeatedly held that "underselling combined with increasing import volumes does not 'necessarily indicate[ ] injury due to pricing in cases involving fungible products.'"  *Coal. for Pres. of Am. Brake Drum & Rotor Aftermkt. Mfrs. V. United States*, 22 CIT 520, 527-28, 15 F. Supp. 2d 918, 925 (1998) (brackets in original) (quoting *USX Corp. v. United States*, 12 CIT 844, 849, 698 F. Supp. 234, 239 (1988)).  Substantial evidence supports the ITC's finding that there is no correlation between subject import underselling and domestic industry prices, and Plaintiffs offer no legal basis for requiring the ITC to adopt or apply a *per se* rule in this case.

---

[7] While Plaintiffs' point is consistent with basic economic theory, the court's standard of review requires the Commission's determination to be based on substantial evidence, not theory.  There may be various reasons that the record facts appear inconsistent with economic theory (at least on their face), including distortions caused by government intervention and unfair trade practices; however, it is the role of the Commission, not this court, to weigh those factors and reach a reasoned conclusion.  *Usinor*, 28 CIT at 1111, 342 F. Supp. 2d at 1272.

### C. The ITC's Analysis of Domestic Producers' Lost Revenue and Sales Allegations Lacks Substantial Evidence and is Not in Accordance With Law

#### 1. Contentions

JMC and Allied argue that the Commission did not act in accordance with law when it referred to the absence of confirmed lost sales and revenues to bolster its finding of no negative price effects.  Specifically, they allege that the Commission failed to acknowledge that the domestic industry's loss of market share demonstrated the existence of lost sales.  (JMC Mot. 20-22; Allied Mot. 12-13.)  They assert that "in an investigation of a highly interchangeable product, [such as CWP,] evidence of increasing import volumes and consistent underselling," as the Commission found here, "are evidence of lost sales and revenues due to imports and, more particularly, lost sales due to pricing."  (JMC Mot. 21 (citation and quotation marks omitted); *accord* Allied Mot. 12-13.)  Moreover, Allied contends that the record contained no confirmed lost sales because "most domestic producer sales are made to distributors, which are generally unable to trace lost sales to imports from a particular source."  (Allied Mot. 12 (citation and quotation marks omitted).)

#### 2. Analysis

Neither the statute nor case law obliges the ITC to examine lost sales and revenues in a specific manner.  *Celanese Chems., Ltd. v. United States*, 31 CIT 279, 301 (2007) ("[T]here is no statutory provision requiring the Commission to analyze lost sales in a particular manner.  The Commission may make such an evaluation on whatever rational basis it chooses." (citation and quotation marks omitted)).  During the

investigation, six of twelve responding producers reported losing sales to subject

imports, and four reported reducing prices or rolling back price increases since 2009

due to subject imports.  However, the responding producers did not provide the

Commission with the detailed information and purchaser contacts that the ITC

considered necessary to investigate and confirm any lost sales and revenue allegations.

Instead, the industry claimed that "most domestic producer sales are made to

distributors, which are generally unable to trace lost sales to imports from a particular

source."  *Views* at 33 n.157 (citing *Staff Report* at V-20-21; Hr'g Tr. 28, 94-96, Oct. 27,

2012).  Thus, only one non-petitioning domestic producer reported three lost sales

allegations, and the ITC could confirm only one of those allegations, which concerned

an insignificant volume of CWP.  *Id.* at 32-33 (citing *Staff Report* at V-21, Table V-7).

The ITC could not confirm any lost revenue allegations.  *Id.* at 33 (citing *Staff Report* at

V-20).

Although the court has held that in markets with fungible goods, such as CWP,

"volume rather than anecdotal evidence may be the best indicator of lost sales,"

*Granges Metallverken AB v. United States*, 13 CIT 471, 481, 716 F. Supp. 17, 26 (1989)

(citations omitted), it has never required the Commission to examine volume *in lieu* of

anecdotal evidence for such purposes, as JMC and Allied request.  *See Copperweld*

*Corp. v. United States*, 12 CIT 148, 169-70, 682 F. Supp. 552, 572 (1988) (noting lack

of any statutory provision requiring ITC to perform any particular type of analysis of lost

sales or revenue allegations) (citing *Maine Potato Council*, 9 CIT 293, 302, 613 F. Supp. 1237, 1245 (1985)).  Thus, the ITC did not err in its reliance on anecdotal evidence of lost sales or revenues.

Once the Commission decided to rely on anecdotal evidence, however, it was still required to address significant arguments of the parties which impacted the reliability of its reasoning and conclusions.  *See, e.g.*, *U.S. Steel Corp. v. United States*, 36 CIT __, __, 856 F. Supp. 2d 1318, 1321 (2012) (citation omitted).  Here, Plaintiffs stated that they could not provide the lost sales and revenue information in the form and manner requested by the Commission due to the structure of the domestic CWP market.  The Commission, however, rejected the argument and simply found that Plaintiffs failed to provide the requested information.  *Views* at 33 n.157.  The Commission went on to find that the absence of confirmed lost sales and revenue allegations provided further support for its finding that subject imports neither depressed nor suppressed domestic like product prices.  *Id*. at 32-33.

Two separate provisions of the statute govern the Commission's handling of situations such as this.  First, 19 U.S.C. §1677m(c) provides that if an interested party notifies the Commission that it is unable to submit the information requested in the requested form and manner, the Commission is to consider the ability of the party to submit the information and may modify its requirements to avoid imposing an unreasonable burden on the party when certain additional requirements are met.  In certain cases, the Commission also is required to provide such parties any assistance that is practicable.  19 U.S.C. §1677m(c).  The record is ambiguous as to whether

domestic interested parties took the necessary steps to properly invoke these provisions and, if so, the extent to which the Commission considered modifying its information requests or otherwise assisting these parties in addressing the questions regarding lost sales and revenue.

Moreover, by treating the lack of confirmed lost sales and revenue as support for its determination, the Commission made an inference adverse to the domestic industry without taking any of the steps required by 19 U.S.C. § 1677e.  Subsection (a) of that provision permits the Commission to use the facts otherwise available to reach a determination when necessary information is not available on the record or an interested party has withheld or otherwise failed to provide such information.  19 U.S.C. § 1677e(a).  The Commission, however, must first find that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information before the Commission may use an inference that is adverse to the interests of that party.  19 U.S.C. § 1677e(b).  The Commission does not appear to have made any determination that domestic interested parties have failed to cooperate by not acting to the best of their ability in failing to provide lost sales or revenue information in the form and manner requested by the Commission.  Accordingly, the court remands this determination to the ITC to reconsider its findings with regard to lost sales and revenue.  Upon remand, the Commission may collect additional evidence relevant to this issue and reconsider any aspect of the *Final Determination* which relied upon or took into consideration the Commission's prior findings regarding lost sales and revenue.

### III. Impact

In evaluating the impact of subject imports on the domestic industry, the

Commission evaluates "all relevant economic factors which have a bearing on the state

of the industry," including, but not limited to:

> (I) actual and potential decline in output, sales, market share, profits,
> productivity, return on investments, and utilization of capacity,
> (II) factors affecting domestic prices,
> (III) actual and potential negative effects on cash flow, inventories,
> employment, wages, growth, ability to raise capital, and investment,
> (IV) actual and potential negative effects on the existing development and
> production efforts of the domestic industry, including efforts to develop a
> derivative or more advanced version of the domestic like product, and
> (V) in a proceeding under part II of this subtitle [concerning the imposition
> of antidumping duties], the magnitude of the margin of dumping.

19 U.S.C. § 1677(7)(C)(iii).  The ITC must analyze these factors "within the context of

the business cycle and conditions of competition that are distinctive to the affected

industry."  *Id.*

The ITC initially explained that it had to "analyze domestic industry performance

in the context of the severe economic downturn in 2009," which included a 37.5 percent

collapse in domestic consumption of CWP, and the following weak economic recovery,

particularly in the area of nonresidential construction.  *Views* at 33 (citing *Staff Report* at

II-14, Figure II-2, Table II-3; Hr'g Tr. 33, 49, 231-32).  In this context, the Commission

found that the domestic industry's performance "improved markedly" during the POI in

"every measure but market share, capacity, and employment."  *Id.* at 34.  The ITC

highlighted domestic industry improvements in production, capacity utilization, domestic

shipments, inventories, hours worked, wages, net sales values, and operating income.

*Id.* at 34-36.  These trends led the Commission to conclude that the domestic industry's

recovery would not have been significantly stronger but for the increase in volume and

market share of subject imports, "particularly in light of the continued weak demand

conditions and substantial nonsubject import competition that also influenced domestic

industry performance."  *Id.* at 34 (footnote omitted) (citing *Staff Report* at Tables IV-3,

IV-10, App. D).

        The ITC also observed no correlation between the domestic industry's

performance and subject import market share because, during the POI, "the domestic

industry's operating income margin generally improved when subject import market

share increased at the industry's expense and weakened when subject import market

share either declined . . . or increased at the expense of nonsubject imports."  *Id.* at 38-

39.  The Commission similarly saw no correlation between subject import underselling

and the domestic industry's performance.  *Id.* at 39.

        The Commission examined five domestic plant closures during the POI and

found that they did not evidence a causal link between subject imports and injury to the

domestic industry.  *Id.* at 41.  It discussed three plants, owned by Allied, Wheatland, and

Leavitt, which closed in 2009 because of the economic downturn.  *Id.* at 41-42 (citing

*Staff Report* at III-4, Tables III-2, IV-10; Allied's Resps. to Comm'r Questions at A-12).

The ITC also observed that the domestic industry invested in "numerous" capacity

expansions and enhancements during the POI.  *Id.* at 42 (citing *Staff Report* at Table

III-2).  Taking these findings in the aggregate, the Commission concluded that subject

imports had no significant adverse impact on, and did not materially injure, the domestic

industry.  *Id.* at 43-44.

### A. The ITC Did Not Explain How It Accounted for the Effects of the Business Cycle on Industry Performance

#### 1. Contentions

Plaintiffs contend that the Commission did not evaluate material injury "'within the

context of the business cycle,'" as required by 19 U.S.C. § 1677(7)(C)(iii), and permitted

the broader economic recovery to "mask" the injurious effects of subject imports on the

domestic industry.  (Wheatland Mot. 5-7, 11 (quoting 19 U.S.C. § 1677(7)(C)(iii));

*accord* JMC Mot. 27-29; *see* U.S. Steel Mot. 8-10; Allied Mot. 10-11, 14-15.)  They

contend that because the POI began in 2009, in the worst economic recession since the

Great Depression, improvements in the domestic industry's performance during the POI

reflected the resurgence of demand accompanying the economic recovery, rather than

the domestic industry's overall health.  (U.S. Steel Mot. 8-9; *accord* JMC Mot. 26-29;

Wheatland Mot. 6-7; Allied Mot. 6-7; *see* Allied Mot. 10.)  Thus, if the ITC had taken the

business cycle into account, it would have found that "the increase in domestic industry

shipments d[id] not indicate the absence of volume-related injury by reason of subject

imports" and that "pervasive and significant underselling . . . cause[d] price suppression

embodied in the domestic industry's poor operating results."  (Wheatland Mot. 7; *see*

JMC Mot. 28-29.)  Because the ITC allegedly failed to disaggregate the beneficial

effects of the economic recovery on the domestic industry from the injury inflicted upon

it by the surge of subject imports, Plaintiffs ask the court to remand the *Final*

*Determination* for further analysis.

## 2.  Analysis

When assessing the effects of subject imports on a domestic industry, the ITC

must "evaluate all relevant factors which have a bearing on the state of the industry in

the United States . . . within the context of the business cycle."  19 U.S.C.

§ 1677(7)(C)(iii); *accord Timken U.S. Corp. v. United States*, 28 CIT 62, 82, 310 F.

Supp. 2d 1327, 1344 (2004).  Such factors may include, but are not limited to, domestic

consumption and demand conditions, the commodity-like nature of domestic and

subject imports, and the capital-intensive nature of the industry.  *Hynix Semiconductor,*

*Inc.*, 30 CIT at 1219-20, 431 F. Supp. 2d at 1314.  This statutory requirement ensures

that positive trends in the business cycle do not mask unfair trading practices.  *Id*. at

1226-27, 431 F. Supp. 2d at 1320; *Timken*, 28 CIT at 82, 310 F. Supp. 2d at 1344;

*CHR. Bjelland Seafoods A/C v. United States*, 16 CIT 945, 956 (1992).

Although the principle underlying the business cycle requirement seems clear,

the statute does not specify how the ITC must frame its determination around it.  In prior

cases, the court has remanded ITC determinations that did not account for, or provided

only conclusory statements addressing, the industry business cycle.  *See, e.g., Hynix*

*Semiconductor*, 30 CIT at 1227, 431 F. Supp. 2d at 1320; *USX Corp. v. United States*,

11 CIT 82, 86, 655 F. Supp. 487, 490 (1987) (holding that mere fact that the industry

was lifted out of recession cannot automatically trigger conclusion that foreign imports

were not affecting domestic market).  By comparison, in *United States Steel Corp. v. United States*, the court found that the ITC substantially incorporated the context of the business cycle into its analysis when it discussed the influence of demand trends and fluctuations in the national economy on the domestic industry's performance.  36 CIT at __, 856 F. Supp. 2d at 1329.

In the present case, the Commission's material injury analysis evaluated the conditions of competition in the industry and found that the economic recession of 2009 significantly depressed domestic consumption of and demand for CWP to a level 37.5 percent below that of 2008.  *Views* at 16-17, 33 (citing *Staff Report* at Figures II-1-2, Table C-1).  It also found that the subsequent languid recovery in CWP demand levels and the nonresidential construction market contributed to the domestic industry's weak performance after 2009 and throughout the POI.  *Id*. at 33 (citing *Staff Report* at II-14, Figures II-1-2, Table II-3; Hr'g Tr. 33, 41, 49, 231-32).  In its volume discussion, the ITC included staff reports from previous investigations of CWP imports from non-subject countries after the parties requested that the Commission account for a possible distortion in the POI data as a result of the economic recession of 2009.  *Id.* at 29 n.134 (citing Allied's Posthr'g Br. 8; Universal's Resps. to Comm'r Questions 1-4).  Using data from these earlier investigations, the ITC found that, despite the low levels of domestic industry market share between 2010 and 2011 as compared to 2009, these levels were still higher than domestic industry market share levels between 2000 and 2008.  *Id.* (citing *Staff Report* at Table IV-10) (citations omitted).  In its impact analysis, the ITC highlighted that "the domestic industry's performance improved markedly" during the

POI, "according to every measure but market share, capacity, and employment." *Id.* at

34.  It then stated that, "[a]lthough these improvements occurred relative to a base year

in which the industry was battered by recession, we find it significant that nearly every

measure of industry performance improved irrespective of trends in subject import

volume, market share, and underselling." *Id.*  It then declared that it "cannot conclude

that the domestic industry's recovery would have been significantly stronger but for the

increase in subject import volume and market share." *Id.* (citing *Staff Report* at Tables

III-3, IV-10, App. D).

        While the Commission referenced the dismal economic conditions that affected

the industry at the beginning of the POI, it did not clearly address whether the

improvements in "nearly every measure of industry performance" may appear significant

because of the broader economic recovery, thereby masking the injurious impact of

subject imports on the domestic industry. *Id.*  Without expressly discussing the effects

of the economic recovery on the domestic industry and explicitly addressing those

effects in contrast to the effects of subject imports, the court cannot assume that the

Commission has evaluated all relevant factors having a bearing on the state of the

industry "within the context of the business cycle."  19 U.S.C. §1677(7)(C)(iii).

        The court recognizes that certain other issues discussed in this opinion (e.g., the

use of pre-POI data, *see infra*) could be considered part of the Commission's proper

consideration of the business cycle; however, in light of the emphasis placed on the

distortive effect of the 2009 economic collapse, it was incumbent upon the Commission

to be clear about how it evaluated all relevant factors, particularly in the aftermath of the

economic collapse, in the context of the business cycle.  The court therefore remands

the Commission's determination so that the Commission may explain how it has

evaluated the relevant economic factors bearing on the state of the domestic industry

within the context of the business cycle.  The Commission may make additional

determinations, including reconsidering issues otherwise addressed and affirmed in this

opinion, as are necessary to account for such explanations.

### B. Substantial Evidence Supports the Commission's Finding of No Correlation Between Increased Subject Import Volume and the Domestic Industry's Financial Performance

#### 1. Contentions

JMC and Wheatland contend that the ITC lacked substantial evidence for its

finding that there was no correlation between the significant increase in subject import

volume and the domestic industry's financial performance.  (JMC Mot. 17-19; *see*

Wheatland Mot. 10.)  According to JMC and Wheatland, the fungibility of, and use of

identical distribution channels by, subject imports and the domestic like product *per se*

demonstrate a strong correlation between increases in subject import volume and the

domestic industry's performance.  (JMC Mot. 14-19; *see* Wheatland Mot. 8-11.)  To

support this assertion, they note that in a 2012 sunset review, the ITC concluded that

any increase in CWP subject import volume '"would likely be in substantial part at the

domestic industry's expense'" because subject imports are '"good substitutes for the

domestic like product, the domestic industry supplies the majority of the U.S. market,

and there appear to be no significant market segments in which the domestic industry

participates exclusively.'"  (JMC Mot. 16 (quoting *Certain Circular Welded Pipe and*

*Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey*, Inv. Nos. 701-

TA-253 and 731-TA-132, 252, 271, 273, 532-34, 536, USCIT Pub. 4333 (June 2012)

(Third Review) at 45); Wheatland Mot. 8-10 (same).)  In more concrete terms, JMC and

Wheatland assert that the fact that subject imports were responsible for nearly all the

domestic industry's market share losses between 2009 and 2011, and that subject

imports captured a greater proportion of the market growth than the domestic industry

during the POI, demonstrate a sustained correlation between subject import volume and

the domestic industry's performance.  (Wheatland Mot. 10-11; *accord* JMC Mot. 16-17.)

## 2.  Analysis

Substantial evidence supports the ITC's finding that there was no correlation

between subject imports' increased volume and the domestic industry's performance

over the course of the POI.  Although subject imports significantly increased their

domestic market share at the expense of the domestic like product between 2009 and

2010, when subject imports gained 3.9 percent, and the domestic industry lost 5.6

percent, of the domestic market, the ITC found that the domestic industry's performance

improved "according to almost every other measure."  *Views* at 38 (citing *Staff Report* at

Tables IV-10, C-1).  In particular, its operating income margin, swung from a loss

equivalent to 15.1 percent of net sales in 2009 to a profit equivalent to 3.5 percent of net

sales in 2010.  *Id.* (citing *Staff Report* at Table VI-1).  By contrast, the ITC observed that

between 2010 and 2011, subject imports gained an additional 1.4 percent of domestic

market share, but primarily at the expense of nonsubject imports, which lost 1.2 percent

of domestic market share.  *Id.* (citing *Staff Report* at Table IV-10).  Although the

domestic industry's market share remained stable from 2010 to 2011, declining only 0.1

percent, its operating income margin fell to 2.3 percent of net sales.  *Id.* at 38-39 (citing

*Staff Report* at Tables IV-10, VI-1).  Then, in the first half of 2011, subject import market

share hit a POI high of 14.7 percent, and the domestic industry's market share fell to

63.8 percent.[8]  *Id.*  At that same time, the domestic industry's operating income reached

a POI high of 6.2 percent of net sales, which the ITC considered as further support for a

lack of correlation between subject import volume and domestic industry performance.

*Id.*  This record evidence led the Commission to conclude that "the domestic industry's

operating income margin generally improved when subject import market share

increased at the industry's expense and weakened when subject import market share

either declined . . . or increased at the expense of nonsubject imports."  *Id.* at 38-39.  It

therefore reasonably found no correlation between subject import volume and the

domestic industry's performance.  *See, e.g.*, *Altx, Inc.*, 26 CIT at 726-29 (approving

ITC's finding of no correlation between subject import volume and domestic industry

performance).

        The court rejects JMC and Wheatland's argument that the fungibility of CWP and

producers' use of identical distribution channels require the Commission to find a

correlation between poor domestic industry performance and increased subject import

volume.  This court has stated that "[v]olume is normally more significant where fungible

_____

[8] Similarly, in the first half of 2012, the domestic industry's operating income margin
declined to 2.7 percent of net sales, as subject import market share fell to 10.0 percent.
*Views* at 38 (citing *Staff Report* at Tables IV-10, VI-1).

goods are involved." *Companhia Paulista de Ferro-Ligas v. United States*, 20 CIT 473,

477 (1996) (citing *USX Corp.*, 11 CIT at 85, 655 F. Supp. at 490 (noting that in price-

sensitive industries that produce fungible products, "the impact of seemingly small

import volumes . . . is magnified in the marketplace") (citation and quotation marks

omitted)); *see Altx, Inc.*, 26 CIT at 718.   However, the court also has recognized that the

ITC "has the discretion – indeed an obligation – to consider and weigh a number of

other pertinent economic and factual criteria, and consider all the facts and

circumstances, including the health of the domestic industry," when determining

whether subject import volume injured the domestic industry, *SCM Corp. v. United*

*States*, 4 CIT 7, 13, 544 F. Supp. 194, 199 (1982); *accord Am. Spring Wire Corp. v.*

*United States*, 8 CIT 20, 23, 590 F. Supp. 1273, 1277 (1984) ("'No factor, standing

alone, triggers a *per se* rule of material injury.'") (citation omitted), *aff'd* 760 F.2d 249

(Fed. Cir. 1985).   The Commission fulfilled this obligation in its analysis when it

examined the facts specific to the domestic CWP industry during the POI.

The court also declines to adopt JMC and Wheatland's proposition that subject

imports *per se* injure the domestic industry if they capture most of the market share lost

by the domestic industry or secure a greater portion of the domestic market's growth

than the domestic like product.   Market share is one of many aspects of the domestic

industry's performance that the Commission must analyze to determine whether the

domestic industry is being injured.   *See* 19 U.S.C. § 1677(7)(C)(iii); *Citrosuco Paulista,*

*S.A.*, 12 CIT 1196, 1209, 704 F. Supp. 1075, 1087-88 (1988).  To limit the injury inquiry

to market share patterns would contravene the ITC's statutory mandate in performing its

investigations.

        Prior ITC determinations with respect to CWP from other countries are of limited

relevance.  First, each determination is *sui generis*, "involving a unique combination and

interaction of many variables, and therefore a prior administrative determination is not

legally binding on other reviews before this court."  *U.S. Steel Corp. v. United States*, 33

CIT 984, 1003, 637 F. Supp. 2d 1199, 1218 (2009) (citing *Nucor Corp.*, 414 F.3d at

1340).  More importantly, the ITC determination to which Plaintiffs cite, *Certain Circular

Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey*,

Inv. Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-34, 536, USCIT Pub. 4333

(June 2012) (Third Review), is not an injury investigation, but a sunset review, which

employs a different standard to justify an affirmative determination.  In an injury

investigation, such as the determination at bar, "'the Commission determines whether

there is *current* material injury by reason of imports of subject merchandise,' or

alternatively 'under the threat of material injury standard, the Commission decides

whether injury is *imminent*, given the status quo.'"  *NSK Corp. v. United States*, 32 CIT

966, 973, 577 F. Supp. 2d 1322, 1332 (2008) (quoting Statement of Administrative

Action Accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-316

(1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4209 ("SAA")).  In a sunset review,

however, "the ITC must engage in an analysis that is prospective, focusing on 'the likely

impact in the reasonable [sic] foreseeable future of an important change in the status

quo—the revocation of an order or termination of a suspended investigation and the elimination of its restraining effects on volumes and prices of imports."' *Id.* (quoting SAA at 4209) (citing *Neenah Foundry Co. v. United States*, 25 CIT 702, 709, 155 F. Supp. 2d 766, 772 (2001)).  In light of these different standards, the Commission's finding of likelihood of continuation or recurrence of material injury to the domestic industry in the sunset review does not demonstrate that the factors discussed therein must be dispositive with respect to the agency's determination of present material injury (or threat thereof) to the domestic industry in these investigations.

### C. The Commission Supported Its Findings on Domestic Industry Plant Closures with Substantial Evidence

#### 1. Contentions

Allied contends that the ITC misinterpreted record evidence concerning Welded Tube of Canada's plant closure in South Carolina and Allied's plant closure in Pennsylvania in 2012.  With respect to Welded Tube's plant, Allied argues that subject imports must have played a role in its closure, because Welded Tube's president ascribed the closure to "[[                                                   ]]" at a time when subject imports had lower prices than nonsubject imports during the POI.  (Allied Mot. 18.)  Turning to its own mill closure, Allied asserts that the Commission drew the wrong conclusions from JMC's distribution of some of the shuttered plant's equipment to other facilities.  Instead of using the equipment to expand production elsewhere, as the ITC found, JMC merely "[[                                                   ]]."

(Allied Mot. 19.)  JMC therefore did not use the parts to restore capacity, but "[[

]]."  (Allied Mot. 19.)

### 2.  Analysis

The ITC has "discretion to make reasonable interpretations of the evidence and

to determine the overall significance of any particular factor in its analysis."  *U.S. Steel*

*Corp.*, 36 CIT at __, 856 F. Supp. 2d at 1321 (citation and quotation marks omitted).

The Commission concluded that it could not ascribe the closure of Welded Tube's plant

to subject imports because the firm's president, Butch Mandel, attributed the closure to

competition from increased low-priced imports, without differentiating between subject

and nonsubject goods, from 2010 onward.[9]  *Views* at 41 (quoting Mandel Aff.).  The

Commission reinforced this conclusion with record evidence that [[

,]] and [[

]] during the POI.  *Id.* at 41-42 (citing *Staff Report* at Tables IV-3, IV-10, C-1,

App. D).  Additionally, the ITC highlighted a contemporaneous trade press article about

the plant closure, which reported that a weak CWP market[10] and Welded Tube's desire

to consolidate its production in Canada led to the closure.  *Id.* at 42 (citing Michael

---

[9]Allied's counsel stated, during oral argument, that he had helped Mr. Mandel draft the
Affidavit in question.  (Hr'g Tr. 28:19-29:4, June 26, 2014.)  That the affidavit was
partially drafted by counsel experienced in trade litigation and well aware of the
difference between "imports" and "subject imports" supports the Commission's careful
reading of the affidavit.

[10] Allied correctly notes that the ITC misinterpreted the article as stating that a weak
construction market, rather than the CWP market, contributed to the plant closure.  *See*
Michael Cowden, *Welded Tube of Canada to Close Mill*, American Metal Market.  This
discrepancy, however, does not undermine the Commission's conclusion that subject
imports did not cause the closure.

Cowden, *Welded Tube of Canada to Close Mill*, American Metal Market).  Although

subject imports undersold nonsubject imports in the quarter when Welded Tube

shuttered the plant, this fact does not undermine the broader record evidence

supporting the ITC's conclusion.  Notably, Welded Tube's president stressed that the

economic conditions that precipitated the plant's closure had taken their toll for years

prior to the shuttering of the plant, not just in that quarter.  (*See* Mandel Aff.)

        With respect to Allied's plant closure, the Commission recognized that Allied

closed its plant "in Pennsylvania due in part to subject import competition," but found

that record evidence indicated that JMC acquired the plant in 2012 and "restored at

least a portion of the mill's capacity by distributing some of the mill's equipment to other

JMC mills."  *Views* at 42 (citing *Staff Report* at VI-20; Kurasz Aff.; American Metal

Market, *JMC to Buy, Gut, and Shut Atkore Plant*, Mar. 14, 2012).  Although the record

indicates that JMC "[[                                                                          ]]"

nothing indicates that JMC used these parts only "[[

                                        ]]" as Allied maintains.  (Allied Mot. 19.)  Regardless of how

the equipment was used, the ITC determined that the effect of the mill's closure, a drop

in domestic production capacity of 0.9 percent between interim 2011 and interim 2012,

"had little impact on the domestic industry."  *Views at* 42 (citing *Staff Report* at Table III-

3).  Consequently, substantial evidence supports the Commission's findings concerning

Welded Tube of Canada's plant closure in North Carolina and Allied's plant closure in

Pennsylvania and, therefore, the court will not disturb these findings.

### D.  The Commission Acted Within Its Discretion in Its Use of the Interim 2011 and 2012 Data

#### 1.  Contentions

JMC and Wheatland assert that the ITC ignored record statements that the

distorting effects of an [[                                    ]] during the first half of 2011 made the

domestic industry's contemporaneous financial results an inconsistent and unreliable

indicator of industry trends.  (JMC Mot. 30; *accord* Wheatland Mot. 13.)  Specifically,

because the interim 2011 financial data "[[


]]" the data made concurrent operating margins

appear inordinately strong and, therefore, not indicative of the domestic industry's actual

performance.  (JMC Mot. 31 (citation and quotation marks omitted); *see* Wheatland Mot.

13-14.)

JMC further avers that the ITC should not have used the subject import market

share data for interim 2012, because the data was skewed by the present petition's

filing, which the ITC found likely to have contributed to a 90.9 percent collapse in

subject imports from India between interim 2011 and interim 2012.  (JMC Mot. 19-20.)

JMC asserts that this decline more than offset the 38.9 percent increase in subject

imports from Oman and 5.7 percent increase from Vietnam during the same period,

artificially depressing the volume and market share of subject imports in interim 2012.

(JMC Mot. 20.)  Therefore, according to JMC, the ITC's use of this distorted data was

improper.

## 2. Analysis

The ITC has "discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor in its analysis." *U.S. Steel Corp.*, 36 CIT at __, 856 F. Supp. 2d at 1321 (citation and quotation marks omitted). The ITC found that the interim 2011 data did not [[

]] as JMC and Wheatland allege.  The ITC noted that in 2011,

[[



]], which it could have classified as [[

]] under the Generally Accepted Accounting Principles.  *Views* at 36 & n.177 (citing *Staff Report* at VI-15-16 & n.15).  By choosing to treat these items as [[

]].

*Id.* at 36 (citing *Staff Report* at IV-15-16).  Moreover, the record shows that the

[[                                      ]] did not pervasively affect domestic producers' operating income in the first half of 2011.  In fact, only [[

]]. *See Staff Report* at VI-12 n.11, Table VI-2.

Tellingly, over half of domestic producers indicated that their "other factory costs" remained stable or increased in the first half of 2011, in comparison with 2010.  *See id.* at Table VI-2.  Therefore, based on its review of industry-wide data, the Commission had substantial evidence for its finding that the interim 2011 data did not overstate the

domestic industry's operating margins.  The court, therefore, will not disturb the ITC's

use of the interim 2011 data.  *See U.S. Steel Corp.*, 36 CIT at __, 856 F. Supp. 2d at

1321.

Regarding the Commission's use of the interim 2012 market share data, 19

U.S.C. § 1677(7)(I) states that:

> [t]he Commission shall consider whether any change in the volume, price
> effects, or impact of imports of the subject merchandise since the filing of
> the petition in an investigation . . . is related to the pendency of the
> investigation and, if so, the Commission *may* reduce the weight accorded
> to the data for the period after the filing of the petition in making its
> determination of material injury, threat of material injury, or material
> retardation of the establishment of an industry in the United States.

19 U.S.C. § 1677(7)(I) (emphasis added).  This provision requires the ITC to consider

whether changes to the industry stem from the pendency of the antidumping or

countervailing investigation, but simultaneously grants "the Commission discretion in

determining how to assess post-filing information."  *Nucor Corp.*, 414 F.3d at 1341.  In

these investigations, the Commission recognized that the filing of the petitions had

"some effect on subject import volume."  *Views* at 27 n.127.  Subject import volume fell

28.1 percent between interim 2011 and 2012, and subject import market share declined

by 4.7 percentage points over the same period.  *Id.* (citing *Staff Report* at Tables IV-2,

IV-10, C-1).[11]  However, the Commission determined that the petition effects did not

warrant discounting the interim 2012 data, because most of the market share was lost

by Indian subject imports and was captured by nonsubject imports rather than the

---

[11] Most of this decline came from India, and the ITC attributed part of the decline to the
filing of the petition.  *Views* at 27 n.127 (citing *Staff Report* at Tables IV-2, IV-10, C-1).

domestic industry.[12]  *Id.* The statute gives the Commission ample discretion to decide

whether to discount evidence due to petition-induced volume changes.  In this case, the

agency provided a reasonable explanation for its decision not to discount the interim

2012 data, and "it is not the court's place to re-weigh the evidence or to suggest that

another alternative was the only appropriate choice."  *AWP Indus., Inc.*, 35 CIT __, __,

783 F. Supp. 2d 1266, 1282 (2011); *see* 19 U.S.C. § 1677(7)(I); *U.S. Steel Corp.*, 36

CIT at __, 856 F. Supp. 2d at 1321 (holding that as long as Commission provides "an

'adequate basis in support of [its] choice of evidentiary weight,'" the court "'must defer'")

(quoting *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1359 (Fed. Cir. 2006)).

### E.  The Commission's Use of Pre-POI Data Was in Accordance with Law

### 3.  Contentions

U.S. Steel and Allied argue that the ITC unlawfully used pre-POI data to discount

the importance of the domestic industry's loss of market share during the POI by

comparing the domestic industry's 2010 and 2011 market share to 2000 through 2008.

(U.S. Steel Mot. 11; *see* Allied Mot. 27.)  They contend that the relevant inquiry should

have simply been "whether the domestic industry . . . lost market share *as a result of*

*subject imports*."  (U.S. Steel Mot. 11 (citation omitted); *accord* Allied Mot. 27 (citing 19

U.S.C. §§ 1671(a)(2)(A)(i), 1673(2)(A)(i)).)  U.S. Steel and Allied assert that if the

---

[12] While the domestic industry's market share fell from 63.8 percent in interim 2011 to 62.7 percent in interim 2012, nonsubject import market share rose from 21.5 to 27.3 percent over the same period.  *Id.* (citing *Staff Report* at Table IV-10).

Commission had performed this analysis, it would have concluded that the increase in

subject imports' market share occurred at the expense of the domestic industry.  (U.S.

Steel Mot. 12; *see* Allied Mot. 27.)

Allied also alleges that the Commission arbitrarily chose which pre-POI data to

use in its analysis.  For example, the Commission did not use pre-POI evidence to

explain its analyses finding a lack of correlation between domestic industry performance

trends, on one hand, and subject import market share and underselling trends, on the

other.  (Allied Mot. 25-26.)  Likewise, the Commission placed domestic industry

performance data from 2000 through 2008 on the record, but did not gather data on

subject import performance and pricing over most of this period.  U.S. Steel similarly

contends that the Commission should have included data from 1999, because it would

have shown that the domestic industry market share in 1999 was 72.2 percent.  (U.S.

Steel Mot. 12-13.)

Allied further argues that, even if it is relevant to compare the domestic industry's

POI performance to its pre-POI performance, unfairly traded imports from China and the

subject countries during the pre-POI period suppressed the domestic industry's market

share, rendering the comparison unreliable.  (Allied Mot. 27-28.)  According to Allied

and U.S. Steel, the ITC's failure to place data on the record for imports from the subject

countries for most of the 2000-2008 period precluded the Commission from addressing

"the possibility that the industry's seemingly improved market share in the POI reflected

reductions in the intensity of competition from both subject imports and unfairly traded

imports from China."  (Allied Mot. 28; *see* U.S. Steel Mot. 13-15.)  Thus, they assert that

any conclusion derived from the 2000-2008 data was unsupported by substantial

evidence. [13]

## 2. Analysis

During the present investigations, the parties requested that the Commission

examine data from previous investigations and reviews involving CWP.  *Views* at 29

n.134 (citing Allied's Posthr'g Br. 8; Universal Resps. to Comm'r Questions 1-4).  They

indicated that the collapse of CWP demand during the economic recession in 2009

would create a distorted view of the domestic industry's market share during the POI.

*Id*. (citing Universal Resps. to Comm'r Questions 1-4); *cf. id.* at 33 (noting that domestic

CWP consumption in 2009 was 37.5 percent below 2008.)  The ITC agreed that 2009

was a highly aberrational year for the domestic industry, and examined certain ITC staff

reports and investigations from 2000-2008 in its analysis.  *Id*. at 29 n.134, 33.  These

reports and investigations were "similar to the scope of [the present] investigations" and

had comparable domestic industry definitions.  *Id*. at 29 n.134.  After putting 2000-2008

data on the record, the ITC found domestic industry market share levels from 2000 to

2008 were lower than in 2010 and 2011, and determined that the increase in subject

---

[13] Contrary to Allied's contention, the ITC did not extend the POI; instead, it used pre-POI data to provide additional context to its POI market share analysis. *Views* at 29 n.134.  Allied erroneously claims that the Commission placed the entire record from previous investigations on the record only two days before the deadline for final comments.  The record indicates that the 2000-2008 market share data was introduced on October 17, 2012 at the ITC hearing, twenty-three days before the deadline for final comments to the Commission.  (*See* ITC Hr'g Materials Ex. 2 (R. Doc. 2-221).)

import volume during the POI did not negatively affect domestic market share levels.  *Id.*

at 28-29 (citing *Certain Circular Welded Pipe and Tube from Brazil, India, Korea,*

*Mexico, Taiwan, Thailand, and Turkey*, Inv. Nos. 701-TA-253 and 731-TA-132, 252,

271, 273, 532-34, 536 (Third Review), USITC Pub. 4333 (June 2012); *Circular Welded*

*Nonalloy Steel Pipe From China*, Inv. No. TA-421-6, USITC Pub. 3807 (Oct. 2005)

(Excerpts); *Circular Welded Carbon-Quality Steel Pipe from China*, Inv. Nos. 701-TA-

447 and 731-TA-1116 (Final), USITC Pub. 4019 (July 2008) (Excerpts).

     In performing this analysis, the ITC accounted for the possibility that the

presence of dumped and subsidized Chinese imports[14] could have artificially depressed

pre-POI market share levels and, thereby, made the domestic industry's POI market

share appear substantially better than it was.[15]  *See id.* at 4-6 (citing *Staff Report* at I-5-

8).  In its assessment of CWP imports, the Commission found that China was by far the

largest source of imported CWP in the U.S. throughout 2000-2007.  *Id.* at 19 (citing *Staff*

*Report* at Table I-1).  Although Allied and U.S. Steel argue that the domestic industry

share was depressed in the pre-POI by these unfairly traded imports, the Commission

found that, after the imposition of antidumping and countervailing duty orders in 2007,

---

[14] The ITC also noted the existence of antidumping duty orders on CWP from Brazil, China, India (for all producers except Zenith Steel Pipes and Industries, Ltd.), Korea, Mexico, Taiwan, Thailand, and Turkey, as well as countervailing duty orders on CWP from China and Turkey.  *Views* at 4-6.

[15] From 2000 to 2008, CWP imports from India (specifically from Zenith and Gujarat Steel Tubes Ltd.), Oman, the UAE, and Vietnam were not subject to antidumping or countervailing duty orders.  *See Views* at 6.  Allied and U.S. Steel provide no legal support, and court has found none, for their argument that the ITC must account for possible market share effects by these non-dumped or non-subsidized imports when evaluating the pre-POI evidence.

CWP imports from China declined 98.4 percent and were "virtually eliminated" from the U.S. market in 2008.  *Id.* at 19 n.89 (citing *Staff Report* at IV-9, Table IV-3), 29 n.134 (citation omitted).  Therefore, the Commission found that Chinese dumped and subsidized imports did not distort the market share data for 2008 and the domestic producers' market share in 2010 and 2011 exceeded that of 2008.

Allied's argument that the court should remand the ITC's material injury analysis, because the use of pre-POI data was arbitrary, is without merit.  The ITC limited its use of pre-POI data to its volume analysis to provide context for the distorted data due to the economic collapse in 2009.  The ITC has discretion to use evidence outside of the POI in its investigations, *see AWP Indus., Inc.*, 35 CIT at __, 783 F. Supp. 2d at 1282, and may reasonably interpret the evidence and use these interpretations to determine the significance of any particular factor in its analysis, *Goss Graphics Sys., Inc. v. United States*, 22 CIT 983, 1008, 33 F. Supp. 2d 1082, 1104 (1998).  The Commission has "broad discretion in determining the weight to be accorded to data in its analysis" and was not obligated to use pre-POI data for all of its analyses simply because it used it for one.  *See Celanese Chems. Ltd v. United States*, 32 CIT 1250, 1263 (2008), *aff'd* 358 F. App'x 174 (Fed. Cir. 2009).

The court also finds U.S. Steel's contention that the ITC arbitrarily ignored U.S. Steel's data on the domestic industry's market share in 1999 without merit.  U.S. Steel failed to exhaust its administrative remedies by not raising this argument before the ITC, and the court declines to consider it in the first instance on appeal.  *Sandvik Steel Co. v. United States*, 164 F.3d 596, 599 (Fed. Cir. 1998) (citing *Sharp Corp. v. United States*,

837 F.2d 1058, 1062 (Fed. Cir. 1988)) (holding that when administrative remedies have

not been exhausted, "judicial review of administrative action is inappropriate").

Moreover, the data on the domestic industry's market share in 1999 is not in the record,

and the ITC is limited to making a determination based only on record evidence.  *See,*

*e.g.*, *Fl. Tomato Exch. v. United States*, 38 CIT __, __ , 973 F. Supp. 2d 1334, 1338

(2014); *Neuweg Fertigung GmbH v. United States*, 16 CIT 724, 726, 797 F. Supp. 1020,

1022 (1992).  Therefore, the court will not further consider this argument.

### IV. Threat of Material Injury

To determine whether subject imports pose a threat of material injury to the

domestic industry, the ITC considers the following factors (in relevant part):

> (I) if a countervailable subsidy is involved, such information as may be
> presented to it by the administering authority as to the nature of the
> subsidy . . . and whether imports of the subject merchandise are likely to
> increase,
> (II) any existing unused production capacity or imminent, substantial
> increase in production capacity in the exporting country indicating the
> likelihood of substantially increased imports of the subject merchandise
> into the United States, taking into account the availability of other export
> markets to absorb any additional exports,
> (III) a significant rate of increase of the volume or market penetration of
> imports of the subject merchandise indicating the likelihood of
> substantially increased imports,
> (IV) whether imports of the subject merchandise are entering at prices that
> are likely to have a significant depressing or suppressing effect on
> domestic prices, and are likely to increase demand for further imports,
> (V) inventories of the subject merchandise,
> (VI) the potential for product-shifting if production facilities in the foreign
> country, which can be used to produce the subject merchandise, are
> currently being used to produce other products, . . .
> (VIII) the actual and potential negative effects on the existing development
> and production efforts of the domestic industry, including efforts to develop
> a derivative or more advanced version of the domestic like product, and

(IX) any other demonstrable adverse trends that indicate the probability that there is likely to be material injury by reason of imports (or sale for importation) of the subject merchandise (whether or not it is actually being imported at the time).

19 U.S.C. § 1677(7)(F)(i).

In the *Views of the Commission*, numerous factors led the ITC to find that the domestic industry was not threatened with material injury.  The Commission assessed the domestic industry's performance during the POI and observed improved performance levels despite the slow post-recession recovery in demand.  *Views* at 45. It also concluded that the significant increases in cumulated subject import volume and market share did not show a likelihood of substantially increased imports.  *Id.*  The Commission next found that the significant excess capacity in India, Oman, the UAE, and Vietnam did not indicate a likelihood of substantially increased subject imports.  *Id*. at 46.  The Commission additionally found "it unlikely that subject foreign producers will increase their focus on the U.S. market in the imminent future at the rate they did" during the POI and projected healthy demand growth in India and the Gulf Cooperation Council ("GCC"), creating no incentive for the producers to shift sales.  *Id*. at 47 (citing *Staff Report* at Tables IV-2, VII-10, C-1; Universal's Resps. to Comm'r Questions 49-50, 53, Exs. 8, 10; Zenith's Resps. to Comm'r Questions 20, Ex. 5; Al Jazeera's Posthr'g Br. 13).  The Commission proceeded to determine that subject import prices would not significantly depress or suppress domestic prices, or stimulate import demand, and found that subject import inventories in the United States, India, Oman, the UAE, and Vietnam did not indicate an imminent likelihood of substantially higher subject imports.

*Id.* at 48.  Finally, the Commission found subject imports "have had no significant actual

or potential negative effects on the existing development and production efforts of the

domestic industry."  *Id*. at 49.

### A.  Substantial Evidence Supports the ITC's Finding that Excess Capacity Did Not Threaten the Domestic Industry

#### 1.  Contentions

JMC and Wheatland challenge the Commission's finding that significant excess

subject producer capacity did not indicate a likelihood of substantially increased subject

imports in the absence of import relief.  (JMC Mot. 33; Wheatland Mot. 15-17.)  They

point to three principal factors to support this argument:  (1) that several subject

producers understated their excess CWP capacity in their responses to the ITC,[16]  and

that subject producers (2) had significant excess capacity and (3) increasing focus on

the U.S. market.  (JMC Mot. 37.)

Addressing subject producers' export orientation and focus on the U.S. market,

JMC and Wheatland claim that the ITC's finding that subject importers from Oman and

---

[16] JMC and Wheatland claim that one producer only reported [[        ]] tons of CWP capacity in its preliminary questionnaire response, and [[          ]] tons in its final questionnaire, even though its corporate documentation places the number at 800,000 tons.  (JMC Mot. 36 (citing Allied, JMC, Wheatland Posthr'g Br., Ex. 11; ADPICO Foreign Producer Questionnaire at II-4, II-10c); *accord* Wheatland Mot. 16.)  They also allege that Al Jazeera reported 300,000 metric tons of capacity in its annual report, while providing the ITC with a figure [[                                        ]].  (JMC Mot. 36 (citing Allied JMC, Wheatland Posthr'g Br. A-29-30, Ex. 9); Wheatland Mot. 16.)  Although Al Jazeera maintained that its capacity constraints stemmed from lack of slitter capacity for hot-rolled coil input, JMC and Wheatland argue that Al Jazeera could easily obtain hot-rolled steel on the world market to boost its CWP output.  (JMC Mot. 36; *accord* Wheatland Mot. 16.)

the UAE would increasingly direct their goods to GCC countries lacks substantial

evidentiary support.  In their view, record evidence revealed that sales to Omani and

Emirati producers' domestic markets fell between 2009 and 2011.  (JMC Mot. 35 (citing

*Staff Report* at VII-7, 11); *accord* Wheatland Mot. 16-17.)  In addition, subject foreign

producers voiced concern about their ability to compete in the GCC market due to the

presence of unfairly traded CWP from China, India, Turkey, and other countries.  (JMC

Mot. 35 (citing Allied, JMC, Wheatland Posthr'g Br. A-46, 49-50, Ex. 9); Wheatland Mot.

17.)

Turning to Vietnam, JMC notes that the Commission received questionnaire

responses from subject Vietnamese importers which projected that the [[      ]] percent

of total Vietnamese shipments that went to the United States in 2009 would grow to

[[          ]] percent in 2013.  (JMC Mot. 37 (citing *Staff Report* at VII-17).)  According to

JMC, Vietnamese subject producers therefore would direct significant excess capacity

to the U.S. market.  (JMC Mot. 37.)  Further, Wheatland asserts that the ITC

understated the significance of the "huge amount of capacity available" in subject

countries because they relied on data provided only by responsive producers.

(Wheatland Mot. 15.)

## 2.  Analysis

Subject producers reported excess capacity of 317,739 short tons in 2009,

266,087 short tons in 2010, and 231,474 short tons in 2011.  *Views* at 46 & nn.224-25

(citing Tables IV-10, VII-10).  The 2011 figure amounted to 15.6 percent of CWP

consumption in the United States in that year.  *Id.* at 46 (citing *Staff Report* at Tables IV-

10, VII-10).  Despite this "substantial" excess capacity, the Commission noted that

subject producers did not increase their exports to the United States, during the POI, to

a level sufficient to injure the domestic industry.  *Id.*  It further noted that subject

producers had increased their production capacity 2.8 percent between 2009 and 2011,

but planned a further increase of only 1.6 percent through 2013.  *Id.* at 46-47 (citing

*Staff Report* at Tables VII-10).  Because the subject imports did not injure the domestic

industry during the POI, the Commission concluded that the modest 1.6 percent

anticipated capacity expansion did not indicate a likelihood of significantly increased

imports of subject merchandise.  *Id.* at 47; *see also Celanese Chems., Ltd.*, 31 CIT at

311 ("[E]ven firm evidence of increased capacity does not necessarily imply increased

exports to the United States.") (citing *Am. Spring Wire Corp.*, 8 CIT at 28, 590 F. Supp.

at 1281).

        Plaintiffs' allegations that some responding subject producers underreported their

CWP production capacity do not undermine this finding.  Plaintiffs argue that one

producer initially indicated, in corporate documentation, that it possessed a total

capacity of 800,000 tons, but reported to the ITC that it had a capacity of [[        ]] tons

and a "practical capacity" of [[                ]] tons.  However, the producer had based the

800,000 ton figure on its total electric resistance welded pipe capacity, (*see* Allied Tube

Posth'rg Br. Ex. 11), while the figures submitted to the Commission were limited to CWP

capacity, (*see* ADPICO Revision to Foreign Producer Questionnaire Resp. 1, II-4, II-

10c).  Plaintiffs' argument that Al Jazeera should have reported a practical capacity of

300,000 metric tons of CWP also is unpersuasive.  The ITC cited record evidence

demonstrating that Al Jazeera's practical capacity was more than [[        ]] metric tons lower due to a bottleneck in its CWP slitting capacity.  (Hr'g Tr. 191-92; Al Jazeera's Posth'rg Br. 13.)  The Commission also found that Al Jazeera was unlikely to expand its capacity because purchasing additional hot-rolled coil inputs to bypass the bottleneck was too costly.  *Views* at 48-49 n.235 (citing *Staff Report* at Table VII-3 n.4, VII-8).

The ITC also found it unlikely that subject producers would increase their focus on the U.S. market in the imminent future at a rate similar to that during the POI.  *Id*. at 47.  Although subject producers increased their focus on the U.S. market during the POI, subject exports to the United States, as a share of total shipments, declined between 2010 and 2011, and the rate of subject import volume increases slowed.  *Id*. (citing *Staff Report* at Tables IV-2, VII-10, C-1).  The ITC also found that projected demand growth in India and the GCC would lead them to divert excess CWP capacity into their domestic markets and diminish subject producers' incentive to shift more sales toward the United States.  *Id*. (citing Universal's Resps. to Comm'r Questions 49-50, 53, Exs. 8, 10; Zenith's Resps. to Comm'r Questions 20, Ex. 5; Al Jazeera's Posthr'g Br. 13).[17]  Consequently, the ITC concluded that any capacity increases by subject producers likely would not threaten the domestic industry.  *See Nitrogen Solutions Fair*

---

[17] For example, home market shipments by Omani and Emirati producers steadily increased after 2010, despite decreased sales prices in their home markets.  *Views* at 47 n.230 (citing Universal Resps. to Comm'r Questions 49-50, 53, Exs. 8, 10; Zenith's Resps. to Comm'r Questions 20, Ex. 5; Al Jazeera's Posthr'g Br. 13).  The Commission expected this trend to continue through 2013.  *Id*. (citing Universal Resps. to Comm'r Questions 49-50, 53, Exs. 8, 10; Zenith's Resps. to Comm'r Questions 20, Ex. 5; Al Jazeera's Posthr'g Br. 13).

*Trade Comm. v. United States*, 29 CIT 86, 105, 358 F. Supp. 2d 1314, 1332 (2005)

(citing *BIC Corp. v. United States*, 21 CIT 448, 464, 964 F. Supp. 391, 405 (1997)

(holding that an "affirmative threat determination requires 'positive evidence tending to

show an intention to increase levels of importation'")).

    JMC's contention that projections that the percentage of total Vietnamese subject

merchandise shipments which are exported to the U.S. would increase from [[    ]]

percent in 2009 to [[    ]] percent in 2013, (*Staff Report* at VII-17), does not undermine

the Commission's finding of likely negative volume effects because Vietnamese imports

accounted for a small percentage of total U.S. apparent consumption during the POI.

(*See Staff Report* at Table C-1).  Moreover, although only two Vietnamese producers

responded to the ITC's questionnaire, the ITC found that these producers accounted for

[[         ]] of Vietnamese CWP exports to the United States and, therefore, based its

findings on the information available, as is its practice.  *Views* at 46 n.224 (citing *Staff

Report* at VII-15 n.29).  In light of these facts, the Commission properly declined to infer

the existence of additional excess capacity and based its analysis on these limited

responses.  *See* 19 U.S.C. § 1677e(a); *Nitrogen*, 29 CIT at 105, 358 F. Supp. 2d at

1332 (finding that "ITC properly declined to consider possible, but undocumented,

excess capacity as evidence of a likely increase in imports," and properly relied on

information available).

    The Commission also examined inventories of subject merchandise.  Although

increased inventories "can contribute to future material injury by increasing the volume

of the product on the market or by suppressing or depressing prices," *see Companhia*

*Paulista de Ferro-Ligas*, 20 CIT at 485, the ITC did not find that inventories in the

present investigation would have such a detrimental effect.[18]  From this data, the ITC

concluded that subject import inventories in the United States, India, Oman, the UAE,

and Vietnam did not indicate an imminent likelihood of substantially greater subject

imports.  *Views* at 48; *see also Am. Bearing Mfrs. Ass'n*, 28 CIT at 1727, 350 F. Supp.

2d at 1126  ("The authority to make a judgment as to the significance of inventory levels

or what  level of inventories is considered high or low rests with the ITC.") (citing *Chung*

*Ling Co. v. United States*, 16 CIT 843, 846, 805 F. Supp. 56, 61 (1992)).

> **B.  Substantial Evidence Supports the Commission's Conclusion that**
>       **Subject Imports Had No Significant Actual or Anticipated**
>       **Negative Effects on the Domestic Industry's Existing**
>       **Development and Production Efforts**
>
>       **1.  Contentions**

JMC and Wheatland challenge the Commission's finding that subject imports had

no actual or anticipated significant negative effects on the domestic industry's

development and production as unsupported by substantial evidence.  (JMC Mot. 38;

---

[18] Responding subject producers' end-of-period inventories declined, as a share of production and total shipments, from 7.8 percent in 2009 to 7.4 percent in 2011, and remained stable between the first half of 2011 and first half of 2012, at 7.8 and 7.9 percent, respectively.  *Views* at 49 (citing *Staff Report* at Table VII-10).  The ITC projected subject producers' end-of-period inventories would be 7.1 percent of production and total shipments in 2012, and 6.7 percent in 2013.  *Id.* at 49 n.240 (citing to *Staff Report* at VII-10).  Further, although the ratio of U.S. importers' end-of-period subject import inventories to subject imports grew from 5.0 percent in 2009, to 6.5 percent in 2010, and 9.1 percent in 2011, and was 6.1 percent in the first half of 2011 and 5.6 percent in the first half of 2012, *see id.* at 48 (citing *Staff Report* at Table VII-11), they were equivalent to only 1.1 percent of domestic consumption in the latter half of 2012, *see id.* at 48 & n.235 (citing *Staff Report* at Tables IV-10, VII-11).

Wheatland Mot. 18.)  They contend that the Commission improperly based its

conclusion on the fact that only two responding producers, which accounted for a

majority of domestic production in 2011, anticipated negative effects on production

operations from subject imports absent relief, even though nine respondents reported

that they anticipated negative effects in general.[19]  They also assert that the

Commission should have weighted each domestic producer's response in accordance

with its production capabilities.  (JMC Mot. 39; Wheatland Mot. 18.)  Reweighing would

show that [[                              ]][20] responding domestic producers, accounting for [[      ]]

percent of domestic production in 2011, anticipated negative effects from subject

imports.  (JMC Mot. 38 (citing JMC Mot. Ex. 1), 40 (detailing various firms' responses);

Wheatland Mot. 18.)  Conversely, only three domestic producers, with [[    ]] percent of

U.S. production in 2011, anticipated no negative effects.  (JMC Mot. 38.)

## 2.  Analysis

The Commission found that six of fifteen responding domestic producers

reported actual negative effects from subject import competition and that only three of

those producers reported actual negative effects on their production operations and

---

[19] As JMC points out, it appears that the ITC mistakenly indicated that [[
            ]] did not report anticipated negative effects from subject imports.  *Compare
Staff Report* at VI-21, *with* JMC Mot. 38 & n.28, Ex. 1 at 1.  If [[         ]] were included
as reporting anticipated negative effects, ten domestic producers would have offered
affirmative responses.
[20] The parties repeatedly refer to fifteen responding domestic producers.  However,
record evidence indicates that, while fifteen domestic producers responded to the
Commission's inquires about actual negative effects, fourteen responded to the
inquiries concerning anticipated negative effects.  *See Staff Report* at VI-20-22.

investments.  *Views* at 49-50 (citing *Staff Report* at VI-20-22).  While nine of fourteen responding domestic producers reported anticipating negative effects from subject imports absent relief, the Commission found that only two[21] of this group reported anticipated negative effects on their production operations and investments.  *Id.* (citing *Staff Report* at VI-20-22).  These responses, in conjunction with the domestic industry's stable capital expenditures over the POI and domestic producers' "numerous investments to modernize and enhance their capacity," provided substantial evidence to support the ITC's conclusion that there is "little evidence" that subject imports would likely impede domestic producers from making needed capital investments in the imminent future.  *Id.* at 50 (citing *Staff Report* at III-11-12, Table III-2).

Because the Commission's domestic producer poll sought to obtain a qualitative, rather than quantitative, assessment of future CWP market conditions, and because CWP are fungible goods, the Commission "s[aw] no reason that the responses should be weighted based on the size of the producer."  *Id.* at 50 n.242.  Particularly in light of the fact that domestic producers could respond to the ITC's questionnaire only affirmatively or negatively, and that the ITC could not assess the extent of the respondents' anticipated negative effects, the ITC reasonably chose not to weigh

---

[21] JMC contends that seven additional domestic producers' responses "explicitly or by necessary implication" indicated anticipated negative effects on production operations. (JMC Mot. 40.)  After reviewing these responses, the court finds that they are sufficiently ambiguous as to whether they imply anticipated negative effects on production operations that the court will not disturb the Commission's reasonable interpretation of the record evidence.  *See Nucor Corp. v. United States*, 28 CIT 188, 232, 318 F. Supp. 2d 1207, 1246 (2004), *aff'd* 414 F.3d 1131; *see Matsushita Elec. Indus. Co.*, 750 F.2d at 933, 936; *Armstrong Bros. Tool Co.*, 626 F.2d at 170 n.3.

producers' responses according to their production levels.  *See Comm. for Fair Beam Imps. v. United States*, 27 CIT 932, 949 (2003) (holding that when statute does not establish method by which ITC must perform analysis, "the court must defer to reasonable and factually supported applications of the ITC's methods"), *aff'd* 95 F. App'x 347 (Fed. Cir. 2004); *see also* 19 U.S.C. § 1677(7)(F)(i)(VIII) (requiring ITC to examine "the actual and potential negative effects on the existing development and production efforts of the domestic industry," but not prescribing method by which to perform analysis).  For these reasons, the court rejects the Plaintiffs' claim and finds that substantial evidence supports the Commission's determinations with respect to actual or anticipated negative effects on the domestic industry's existing development and production efforts.

## CONCLUSION

For the reasons provided above, the court  grants in part and denies in part Plaintiff's and Plaintiff-Intervenors' Motions for Judgment on the Agency Record and remands the *Final Determination* to the International Trade Commission for further proceedings in accordance with this opinion.  On remand, the ITC shall reconsider its findings with regard to lost sales and revenue, taking into account Plaintiffs' argument that the structure of the domestic CWP market precludes Plaintiffs from providing the ITC the lost sales and revenue information in the form and manner in which it was sought.  The ITC also shall explain how it has evaluated the impact of subject imports on the domestic industry within the context of the business cycle.  The Commission, in its discretion, may collect additional evidence relevant to these remanded issues.  While

the court has considered and affirmed other aspects of the Commission's determination

in this opinion, based on the existing record, these affirmations do not preclude the

Commission from reconsidering any aspect of the *Final Determination* which relied upon

or took into consideration its prior findings on the remanded issues.  A separate order

will follow.


                                                      /s/      Mark A. Barnett
                                                      Mark A. Barnett, Judge

                 October 15, 2014
Dated:_____
                 New York, New York