Slip Op. **15-51**

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| JMC STEEL GROUP,<br><br>　　　Plaintiff,<br><br>ALLIED TUBE AND CONDUIT,<br>WHEATLAND TUBE, and UNITED<br>STATES STEEL CORPORATION,<br><br>　　　Plaintiff-Intervenors,<br><br>v.<br><br>UNITED STATES,<br><br>　　　Defendant,<br><br>AL JAZEERA STEEL PRODUCTS CO.<br>SOAG, VIETNAM HAIPHONG<br>HONGYUAN MACHINERY<br>MANUFACTORY CO., LTD.,<br>UNIVERSAL TUBE AND PLASTIC<br>INDUSTRIES, LTD., KHK<br>SCAFFOLDING & FORMWORK, LLC,<br>UNIVERSAL TUBE AND PIPE<br>INDUSTRIES, LLC, ZENITH BIRLA<br>(INDIA) LIMITED, and CONARES<br>METAL SUPPLY LIMITED,<br><br>　　　Defendant-Intervenors. | Before: Mark A. Barnett, Judge<br>Court No. 13-00022 |

OPINION

[The court sustains the International Trade Commission's Redetermination.]

Dated:  May 29, 2015

*John R. Magnus*, Tradewins LLC, of Washington, DC, for plaintiff.

*Roger B. Schagrin* and *John W. Bohn*, Schagrin Associates, of Washington, DC, for plaintiff-intervenor Allied Tube and Conduit.

*Stephen P. Vaughn*, *Robert E. Lighthizer*, and *James C. Hecht*, Skadden, Arps, Slate, Meagher & Flom LLP, of Washington, DC, for plaintiff-intervenor United States Steel Corporation.

*Gilbert B. Kaplan* and *Brian E. McGill*, King & Spalding, LLP, of Washington, DC, for plaintiff-intervenor Wheatland Tube.

*Karl von Schriltz*, Attorney, Office of the General Counsel, *Dominic L. Bianchi*, General Counsel, and *Andrea C. Casson*, Assistant General Counsel for Litigation, U.S. International Trade Commission, of Washington, DC, for defendant.

*David L. Simon*, Law Offices of David L. Simon, of Washington, DC, for defendant-intervenor Al Jazeera Steel Products Co. SAOG.

*Donald B. Cameron*, *Julie C. Mendoza*, *R. Will Planert*, *Brady W. Mills*, *Mary S. Hodgins*, and *Sarah S. Sprinkle*, Morris, Manning & Martin LLP, of Washington, DC, for defendant-intervenors Universal Tube and Plastic Industries, Ltd., KHK Scaffolding & Formwork, LLC, and Universal Tube and Pipe Industries, LLC.

*Max F. Schutzman*, *Ned. H. Marshak*, and *Kavita Mohan*, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP, of New York, NY, for defendant-intervenors Zenith Birla (India) Ltd. and Conares Metal Supply Ltd.

*Robert F. Gosselink* and *Jonathan M. Freed*, Trade Pacific, PLLC, of Washington, DC, for defendant-intervenor Vietnam Haiphong Hongyuan Machinery Manufactory Co., Ltd.

Barnett, Judge:  This matter, which arises from the International Trade

Commission's ("ITC" or "Commission") antidumping and countervailing duty

investigations into certain circular welded carbon-quality steel pipe ("CWP") from India,

Oman, the United Arab Emirates, and Vietnam ("subject imports"), returns to the court

following remand to the Commission in *JMC Steel Group v. United States*, 38 CIT __,

24 F. Supp. 3d 1290 (2014) ("*JMC I*").[1]  In that decision, the court ordered the

Commission to (1) "reconsider its findings with regard to lost sales and revenue, taking

---

[1] The court presumes familiarity with the background and procedural history of the case, although relevant portions are summarized below.

into account [the] argument that the structure of the domestic CWP market precludes Plaintiffs from providing the ITC the lost sales and revenue information in the form and manner in which it was sought," and (2) "explain how it has evaluated the impact of subject imports on the domestic industry within the context of the business cycle."  *Id.* at __, 24 F. Supp. 3d at 1321.  On February 9, 2015, the ITC filed its final negative injury remand results, in which it again found no material injury or threat thereof to the domestic industry.  *See Views of the Commission*, USITC Pub. 4521, Inv. Nos. 701-TA-482-484 and 731-TA-1191-1194 (Final) (Remand) (Feb. 2015) ("*Remand Views*").[2] Plaintiff, JMC Steel Group, and Plaintiff-Intervenors, United States Steel Corporation and Wheatland Tube, ("Plaintiffs") challenge the remand results.[3]  (*See generally* Confidential Comments of JMC Steel Group, Wheatland Tube, and United States Steel Corporation on the Commission's Remand Determination ("Comments") (ECF No. 152).)  For the reasons stated below, the remand results are sustained.

BACKGROUND AND PROCEDURAL HISTORY

### A.  The Administrative Proceedings

On October 26, 2011, Plaintiffs filed a petition with the ITC, alleging material injury and threat of material injury by reason of the subject imports.  *See Circular Welded Carbon-Quality Steel Pipe from India, Oman, United Arab Emirates, and Vietnam*, 76 Fed. Reg. 68,208 (ITC Nov. 3, 2011) (initiation of antidumping and

---

[2] All citations to the *Remand Views* and to the agency record are to their confidential versions.
[3] Plaintiff-Intervenor Allied Tube and Conduit did not submit comments on the remand results.

countervailing duty investigations).  In December 2012, the ITC published a final

determination, *Circular Welded Carbon-Quality Steel Pipe from India, Oman, the United

Arab Emirates, and Vietnam*, 77 Fed. Reg. 73,674 (ITC Dec. 11, 2012) ("*Final

Determination*"), and accompanying *Views of the Commission*, USCIT Pub. 4362, Inv.

Nos. 701-TA-482-484 and 731-TA-1191-1194 (Final) (Dec. 2012) ("*Original Views*"),

which examined a period of investigation ("POI") of January 2009 through June 2012.

The Commission determined that subject imports and the domestic like product are

"generally fungible," share the same channels of distribution, have a "reasonable

overlap" of competition, and that price is a significant factor in CWP purchasing

decisions.  It found a significant increase in the volume of subject imports during the

POI, in absolute terms and relative to domestic consumption and production, but

concluded that the increase did not have significant adverse effects on the domestic

industry.  Although the ITC observed that subject imports "pervasively undersold" the

domestic like product by significant margins during the POI, it nevertheless found "no

evidence" that subject imports significantly depressed or suppressed prices of the

domestic like product.  The ITC also found that the domestic industry's performance

improved in "almost every measure [during the POI] despite the weak recovery in CWP

demand" following the 2008 economic crisis and that there was no correlation between

subject import volume, market share, and underselling, on the one hand, and domestic

industry performance, on the other.  The Commission thus determined that the subject

imports neither caused nor threatened to cause material injury to the domestic industry.

*See generally Final Determination*; *Original Views*.

**B.  *JMC I***

Plaintiffs challenged the *Final Determination* on numerous grounds.  (*See generally* ECF Nos. 71, 76, 77, 82, 85.)  In *JMC I*, the court addressed Plaintiffs' arguments and affirmed, in part, and remanded, in part, the determination.  Of relevance to the present opinion, the court found that the ITC did not assume that negative volume effects alone cannot warrant an affirmative injury determination and also held that "the fact that the ITC found a significant increase in subject import volume and market share does not compel an affirmative injury determination."  *JMC I*, 38 CIT at __, 24 F. Supp. 3d at 1299.  The court also affirmed the Commission's findings that there was no correlation between increased subject import volume and negative price effects on the domestic like product, and between subject imports' increased volume and the domestic industry's performance during the POI.  *Id.* at __, 24 F. Supp. 3d at 1302-03, 1306-10.

The court, however, remanded the *Final Determination* to the ITC on two grounds.  First, the court questioned the Commission's treatment of the domestic producers' lost sales and revenue allegations in the price effects analysis.  *Id.* at __, 24 F. Supp. 3d at 1304-05.  Plaintiffs had averred that they could not provide lost sales and revenue information, in the form and manner requested by the Commission, due to the structure of the domestic CWP market.  The court held that, in such circumstances, pursuant to 19 U.S.C. § 1677m(c), the Commission must "consider the ability of the party to submit the information and may modify its requirements to avoid imposing an unreasonable burden on the party when certain additional requirements are met.  In

certain cases, the Commission also is required to provide such parties any assistance that is practicable." *Id.* at __, 24 F. Supp. 3d at 1304-05 (citation omitted).  The court found that "[t]he record is ambiguous as to whether domestic interested parties took the necessary steps to properly invoke these provisions and, if so, the extent to which the Commission considered modifying its information requests or otherwise assisting these parties in addressing the questions regarding lost sales and revenue." *Id* at __, 24 F. Supp. 3d at 1305.  The court concluded that the ITC had, in effect, treated the domestic industry's inability to provide this information, in the form and manner requested, as an adverse inference against it, without addressing the requirements of 19 U.S.C. § 1677e. *Id.*  The court remanded the issue and instructed the ITC to reconsider its findings with regard to lost sales and revenue.  *Id.*  The court also ruled that "the Commission may collect additional evidence relevant to this issue and reconsider any aspect of the *Final Determination* which relied upon or took into consideration the Commission's prior findings regarding lost sales and revenue." *Id.*

Second, the court found that the ITC, in assessing the effects of subject imports on the domestic industry, did not "'evaluate all relevant factors which have a bearing on the state of the [CWP] industry in the United States . . . within the context of the business cycle,'" as required by 19 U.S.C. § 1677(7)(C)(iii). *Id.* at __, 24 F. Supp. 3d at 1307 (ellipses in original) (quoting 19 U.S.C. § 1677(7)(C)(iii)).  Specifically, the court stated:

> While the Commission referenced the dismal economic conditions that affected the industry at the beginning of the POI, it did not clearly address whether the improvements in nearly every measure of industry

performance may appear significant because of the broader economic recovery, thereby masking the injurious impact of subject imports on the domestic industry. Without expressly discussing the effects of the economic recovery on the domestic industry and explicitly addressing those effects in contrast to the effects of subject imports, the court cannot assume that the Commission has evaluated all relevant factors having a bearing on the state of the industry within the context of the business cycle.

The court recognizes that certain other issues discussed in this opinion (e.g., the use of pre-POI data . . . ) could be considered part of the Commission's proper consideration of the business cycle; however, in light of the emphasis placed on the distortive effect of the 2009 economic collapse, it was incumbent upon the Commission to be clear about how it evaluated all relevant factors, particularly in the aftermath of the economic collapse, in the context of the business cycle. The court therefore remands the Commission's determination so that the Commission may explain how it has evaluated the relevant economic factors bearing on the state of the domestic industry within the context of the business cycle. The Commission may make additional determinations, including reconsidering issues otherwise addressed and affirmed in this opinion, as are necessary to account for such explanations.

*Id.* at __, 24 F. Supp. 3d at 1308 (internal citations and quotation marks omitted).

### C. Remand Results

On remand, the ITC declined to reopen the record. *Remand Views* at 6 (citation omitted). The Commission determined not to reconsider "those issues either affirmed by the Court or not subject to appeal, and therefore adopt[ed] its findings, analysis, and conclusions with respect to those issues in their entirety, including domestic like product, domestic industry, negligibility, cumulation, legal standards, and conditions of competition." *Id.* at 6-7. It also adopted "those portions of the Original Views pertaining to the analysis of volume, price, impact, and threat that were affirmed by the Court . . . or not subject to appeal." *Id.* at 7.

In its revised lost sales and revenue analysis, the ITC noted that the court had

affirmed its finding that subject imports had no negative price effects on the domestic

like product.  *Id.* at 10.  The ITC then determined that it "ha[d] no need to rely on the

absence of confirmed lost sales and revenue allegations as further support for these

findings."  *Id.*  In response to the court's order that the Commission "tak[e] into account

Plaintiffs' argument that the structure of the domestic CWP market precludes Plaintiffs

from providing the ITC the lost sales and revenue information in the form and manner in

which it was sought," *JMC I*, 38 CIT at __, 24 F. Supp. 3d at 1321, the Commission

reexamined the record and found "no evidence that the domestic interested parties

invoked [19 U.S.C. § 1677m(c)], nor d[id] the domestic interested parties claim to have

done so" during the remand proceedings.  *Remand Views* at 8 n.29.  The Commission

clarified that it does not make adverse inferences against parties for failing to report lost

sales and revenue allegations because, *inter alia*, responses to lost sales and revenue

questions are voluntary.  *Id.* at 10-11 ("Because the reporting of lost sales and revenue

allegations is voluntary, . . . the domestic interested parties' alleged inability to report

such allegations . . . would not have constituted a failure . . . to cooperate to the best of

their ability . . . within the meaning of the statutory provision governing adverse

inferences.") (citing 19 U.S.C. § 1677e(a)).  When a party cannot respond to the best of

its ability to such a request, "the Commission's practice has been to rely on the

information available, rather than resorting to the use of adverse inferences."  *Id.* at 11-

12.

With regard to the second remanded issue, the ITC reassessed the domestic industry's performance in the context of the business cycle, and, in particular, whether the economic downturn in 2009 and subsequent recovery masked injury to the domestic industry by subject imports.  *Id.* at 16-27.  The ITC found that the domestic industry improved "markedly during the POI according to every measure except market share, capacity, and employment," although the domestic industry faced weak CWP demand due to the lackluster economic recovery.  *Id.* at 18 (citing *Original Views* at 34-37) (adopting full discussion of domestic industry's performance in *Original Views*).  Stated differently, the ITC concluded that the tepid economic recovery did not obscure injury to the domestic industry.

The ITC also contrasted the effects of the economic recovery with those of subject imports to discern whether subject imports had a significant adverse impact on the domestic industry that was distinguishable from the business cycle.  The Commission concluded, for several reasons, that "the domestic industry's recovery would not have been significantly stronger but for the increase in subject import volume and market share."  *Id.* at 23.  First, the absence of a significant decline in the domestic industry's performance, irrespective of trends in subject import volume, market share, and underselling, was "consistent with the weak recovery in CWP demand during the period."  *Id.* at 23-24 (noting increased U.S. shipments, stable market share compared to 2000-2008, increased prices in three of four pricing products and average value of U.S. shipments, reduced ratio of cost of goods sold ("COGS") to net sales, and improved, though irregular, operating income and operating income margin).  Second,

there was no correlation between the performance of the domestic industry and subject import market share, underselling, or the size of the underselling margins.  *Id.* at 25-26 (citing *Original Views* at 30-32, 38-39; *Staff Report* at Tables V-1-4, VI-1).  Finally, "the significant presence of competitively-priced nonsubject imports in the U.S. market throughout the POI further undermines any possible relationship between subject import competition and the domestic industry's performance during the period."  *Id.* at 26 (citing *Staff Report* at Tables IV-3, IV-10, C-1, App. D).

After addressing these remand issues, the ITC concluded that it was unnecessary to "reconsider issues otherwise addressed and affirmed by the Court" in *JMC I*.  *Id.* at 7.  In a 4-2 vote, the ITC again determined that subject imports neither caused nor threatened to cause material injury to the domestic industry.  *Id.* at 1.

Plaintiffs now challenge the remand results on three grounds.  They contest, as unsupported by substantial evidence or not in accordance with law, (1) the ITC's alleged use of the absence of lost sales allegations to support its finding of no negative volume effects, (Comments at 11-13); (2) the ITC's alleged failure to explain why the domestic industry's loss of market share to subject imports did not lead to an affirmative injury determination, (Comments at 4-11); and (3) its finding of no correlation between subject import volume and the domestic industry's financial performance, (Comments at 13-25).

## STANDARD OF REVIEW

The standard of review applicable to a challenge to a remand determination is the same as that applicable to an original agency determination: the court will uphold an agency determination that is supported by substantial evidence and otherwise in

accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i); *Spa v. E.I. Dupont de Nemours*, 26

CIT 1357, 1360-61 (2002), *aff'd*, *Ausimont SpA v. United States*, 90 F. App'x 399 (Fed.

Cir. 2004).  Substantial evidence is "'such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion.'"  *Huaiyin Foreign Trade Corp. (30)*

*v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Consol. Edison Co. v.*

*N.L.R.B.*, 305 U.S. 197, 229 (1938)).  "[T]he court may not reweigh the evidence or

substitute its own judgment for that of the agency."  *Usinor v. United States*, 28 CIT

1107, 1111, 342 F. Supp. 2d 1267, 1272 (2004) (citation omitted).

## DISCUSSION

As discussed above, in *JMC I*, the court remanded the ITC's determination with

regard to two issues:  (1) the ITC's treatment of the domestic producers' lost sales and

revenue allegations in its price effects analysis and (2) its evaluation of the domestic

industry in the context of the business cycle.  The court affirmed all other aspects of the

*Final Determination*.  While the court authorized the Commission to reconsider any

aspect of the *Final Determination* that relied upon or took into consideration its prior

findings on the remanded issues, the Commission determined to affirm its original

findings in the price effects analysis, without considering lost sales and revenue

allegations, and provided further explanation of the role of the business cycle in the

domestic industry's performance.  In making those findings, the Commission found it

unnecessary to reconsider any other aspect of its Final Determination.  Therefore, the

Commission's findings, apart from the two issues remanded for further consideration,

are effectively final.

### A.  Lost Sales and Revenue Allegations

In *JMC I*, the court ordered the ITC to reevaluate its treatment of the domestic producers' lost sales and revenue allegations in its price effects analysis to account for Plaintiffs' assertion that they could not provide lost sales and revenue information, in the form and manner requested by the Commission, due to the structure of the domestic CWP market.  The court further concluded that the ITC had, in effect, treated the domestic industry's inability to provide this information as an adverse inference against it, without addressing the requirements of 19 U.S.C. § 1677e.

In the remand results, the ITC expressly abandoned the use of lost sales and revenue allegations in the price effects analysis.  *Remand Views* at 10.  It noted that the court had affirmed its finding that subject imports had no negative price effects on the domestic like product and, therefore, concluded that it "ha[d] no need to rely on the absence of confirmed lost sales and revenue allegations as further support for these findings."  *Id.* (footnote omitted).  The Commission also clarified that it does not make adverse inferences against parties for failing to report lost sales and revenue allegations; rather, when a party does not submit lost sales and revenue allegation reports, "the Commission's practice has been to rely on the information available, rather than resorting to the use of adverse inferences."  *Id.* at 10-12.

Because the Commission expressly abandoned any reliance on the lack of verifiable lost sales and revenue allegations in making its remand determination, the Commission has addressed the court's concern that the agency improperly used the

domestic producers' failure to provide lost sales and revenue allegations as a basis for an adverse inference against the domestic industry.

Plaintiffs now assert that the ITC unlawfully used the absence of lost sales allegations to support its finding of a lack of negative volume effects in the remand results.  (Comments at 11-13.)  They aver that the Commission should have treated the increase in subject import volume and market share between 2009 and 2011 as evidence of lost sales.  According to Plaintiffs, by using its longstanding methodology, the Commission repeated the error that the court found in the ITC's price effects analysis in *JMC I*, i.e. that it may have failed to account for Plaintiffs' assertions that they could not provide the lost sales information in the form and manner requested by the Commission due to the structure of the domestic CWP market and, therefore, made an unlawful adverse inference against them.  (Comments at 12-13 (citing *JMC I*, 38 CIT at __, 24 F. Supp. 3d at 1304-05).)

In the *Remand Views*, the Commission explicitly adopted the volume arguments and findings in the *Original Views.  Remand Views* at 7.  The Commission did not take into account the absence of verifiable lost sales allegations when conducting those analyses.  *See Original Views* at 28-29.  In fact, in the *Remand Views*, the language that provides the basis for Plaintiffs' objection merely describes the methodology the ITC customarily employs when analyzing lost sales and revenue.  *Remand Views* at 10 n.40.  This explanation of standard practice does not indicate that the Commission used the absence of lost sales allegations in its evaluation of subject imports' volume effects as Plaintiffs allege.

In certain prior cases, the court has held that in markets with fungible goods, such as CWP, "volume rather than anecdotal evidence may be the best indicator of lost sales." *Granges Metallverken AB v. United States*, 13 CIT 471, 481, 716 F. Supp. 17, 26 (1989) (citations omitted). However, the court has never required the Commission to examine volume *in lieu* of anecdotal evidence for such purposes. *See Copperweld Corp. v. United States*, 12 CIT 148, 169-70, 682 F. Supp. 552, 572 (1988) (noting lack of any statutory provision requiring ITC to perform any particular type of analysis of lost sales or revenue allegations) (citing *Me. Potato Council v. United States*, 9 CIT 293, 302, 613 F. Supp. 1237, 1245 (1985)). It is not enough for Plaintiffs simply to proffer an alternate methodology to that relied upon by the agency, even if that alternate methodology is reasonable and not inconsistent with the statute.[4] Plaintiffs must demonstrate that the ITC could not properly rely on its selected methodology, something they have failed to do. The court will not disturb the ITC's analysis of subject import volume and market share, notwithstanding the fungible nature of CWP. *See JMC I*, 38 CIT at __, 24 F. Supp. 3d at 1304.

---

[4] When evaluating challenges to the ITC's choice of methodology, the court will affirm the chosen methodology as long as it is reasonable. *Shandong TTCA Biochemistry Co. v. United States*, 35 CIT __, __, 774 F. Supp. 2d 1317, 1327 (2011) (citing *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1361-62 (Fed. Cir. 1996)); *accord Hynix Semiconductor, Inc. v. United States*, 30 CIT 1208, 1210, 1215, 431 F. Supp. 2d 1302, 1306, 1310-11 (2006). When presented with a challenge to the Commission's methodology, the court examines "not what methodology [Plaintiffs] would prefer, but . . . whether the methodology actually used by the Commission was reasonable." *Shandong TTCA Biochemistry Co.*, 35 CIT at __, 774 F. Supp. 2d at 1329 (citation and internal quotation marks omitted).

The court therefore sustains the Commission's treatment of lost sales and revenue allegations.

### B.  The Business Cycle

In *JMC I*, the court ordered the ITC to explain how it evaluated the relevant economic factors bearing on the state of the domestic industry within the context of the business cycle, as required by 19 U.S.C. § 1677(7)(C)(iii).  Specifically, the court ordered the Commission to address whether the improvements in nearly every measure of the domestic industry's performance during the POI may have appeared significant due to the economic collapse in 2009 and subsequent economic recovery, thereby masking the injurious impact of subject imports on the domestic industry.

In the remand results, the ITC undertook a two-part analysis of the business cycle and its effects on the domestic industry.  It first examined the effects of the economic recovery on the performance of the domestic industry "in the context of the severe economic downturn in 2009 that depressed apparent U.S. consumption to a level 37.5 percent below that in 2008, and the weak demand recovery thereafter." *Remand Views* at 16-17 (footnote omitted) (citations omitted).

The Commission found that the domestic industry's performance improved in nearly every measure, except market share, capacity, and employment, during the POI, even though CWP demand remained weak.  *Id.* at 18 (footnote and citations omitted). Growth in U.S. consumption led to increased production and U.S. shipments by the domestic industry.  *Id.* (citing *Staff Report* at Tables III-3, IV-9, C-1).  Although the domestic industry's market share fell during the POI, the ITC concluded that the

disproportionate effect of the recession on imports had made the 2009 rate unusually high and, therefore, exaggerated the decline in market share.  *Id.* (citing *Staff Report* at Table C-1).

Although the domestic industry's capacity fell during the POI, the Commission attributed the decline to the recession rather than subject imports.  *Id.* at 19 (citing *Original Views* at 30).  Moreover, the decline, in conjunction with increased production, boosted the capacity utilization rate, and capital investment remained stable.  *Id.* (citing *Original Views* at 42-43; *Staff Report* at Tables III-3, C-1)).

Employment in the domestic industry fell between 2009 and 2011, but hours worked and wages paid rose due to increased production and shipments.  *Id.* (citing *Staff Report* at Tables III-7, C-1).  From interim 2011 to interim 2012, industry employment and wages rose, and hours worked remained steady.  *Id.* at 19-20 (citing *Staff Report* at Tables III-7, C-1).  The domestic industry's productivity was unchanged between 2009 and 2011, and peaked in interim 2012.  *Id.* at 20 (citing *Staff Report* at Tables III-7, C-1).

The domestic prices for three of four pricing products increased during the POI, as did the average unit value of the domestic industry's U.S. shipments, and the domestic industry's COGS to net sales ratio declined.  The ITC found these trends "[c]onsistent with recovering demand."  *Id.* (citing *Original Views* at 30-32).

The ITC found that the domestic industry's recovering sales and prices directly led to improved financial performance.  Operating income grew from a loss equivalent to negative 15.1 percent of net sales in 2009, to a positive 3.5 percent of net sales in 2010

and 2.3 percent of net sales in 2011.  *Id.* (citing *Staff Report* at Tables VI-1, C-1).
Although the domestic industry did not return to the performance levels that it had
enjoyed prior to 2008, the Commission concluded that this tempered performance
stemmed from "the anemic recovery in CWP demand during the POI," and not subject
imports.  *Id.* at 21-22 (footnote and citation omitted).

In the second part of its business cycle analysis, the Commission compared the
effects of the economic downturn and recovery on the domestic industry with those of
subject imports on the domestic industry to discern "whether subject imports had a
significant adverse impact on the domestic industry that [was] distinguishable from the ill
effects of the economic downtown of 2009 and the weak recovery thereafter."  *Id.* at 23.
The Commission first noted the absence of "a significant decline in domestic industry
performance during the POI that could support a significant adverse impact finding."  *Id.*
It then examined the domestic industry's performance during the POI and reiterated that
it improved by most measures, "irrespective of trends in subject import volume, market
share, and underselling."  *Id.*  Citing to increased U.S. shipments, market share levels
"that compared favorably to th[ose] during the 2000-2008 period," higher prices on three
of four pricing products, rising average unit values of U.S. shipments, higher operating
income and operating income margins, and lower COGS to net sales ratios, the ITC
reaffirmed that "[t]hese improvements . . . were consistent with the weak recovery in
CWP demand during the period."  *Id.* at 23-24 (footnotes and citations omitted).

Further analysis led the ITC to conclude that the presence of subject imports in
the domestic market did not significantly affect the domestic industry's performance.  It

found no correlation between domestic industry performance trends and subject import market share or underselling.[5]  *Id.* at 24-26.  Subject imports took significant market share from the domestic industry only between 2009 and 2010, a period which coincided with improvement in the domestic industry "by almost every measure," including a swing in its operating income margin from negative 15.1 percent to a positive 3.5 percent.  *Id.* at 24 (citing *Staff Report* at Tables IV-10, VI-1, C-1).  Between 2010 and 2011, subject imports' 1.4 percent gain in market share occurred "largely at the expense of nonsubject imports."  *Id.*  Nevertheless, the domestic industry's income and operating income margin fell.  *Id.* at 25 (citing *Staff Report* at Tables IV-10, VI-1, C-1).  The domestic industry's operating income and operating income margin peaked in interim 2011, when the market share of subject imports also peaked, and fell in interim 2012, although subject import volume and market share fell as well.  *Id.* (citing *Staff Report* at Tables IV-10, VI-1, C-1).

The Commission also found that the significant underselling by subject imports, which occurred throughout the POI, did not significantly depress or suppress the prices of the domestic like product.  *Id.* (citing *Original Views* at 30-32).  During the POI, the domestic industry increased prices on three of four pricing products, increased the average unit value of U.S. shipments, improved the metal margin, and reduced its COGS to net sales ratio.  *Id.* at 25-26 (citing *Original Views* at 30-32).  This lack of correlation between domestic industry performance and subject import underselling

---

[5] The court affirmed these findings in *JMC I*.  38 CIT at __, 24 F. Supp. 3d at 1302-03, 1309-10.

continued even when accounting for the prevalence and degree of underselling. *Id.* at

26 (citing *Staff Report* at Tables V-1-4, VI-1).  Between 2009 and 2010, the domestic

industry's performance improved "markedly by most measures," even though the

prevalence of subject import underselling rose, and the margin of underselling was at its

highest point of the POI. *Id.* (citing *Staff Report* at Tables V-1-4, VI-1).  Although the

prevalence of underselling increased further in 2011, the domestic industry's

performance improved, with the exceptions of its operating income and operating

income margin. *Id.* (citing *Staff Report* at Tables V-1-4, VI-1).  The domestic industry's

operating income margin reached a peak in interim 2011, despite underselling by

subject imports in all quarterly comparisons, and that operating income margin declined

in interim 2012, even though the prevalence and margin of underselling by subject

merchandise fell. *Id.* (citing *Staff Report* at Tables V-1-4, VI-1).

The Commission examined nonsubject imports and found that they held a higher

market share, and had lower prices, than subject imports and the domestic like product

during the POI. *Id.* (citing *Staff Report* at Tables IV-3, IV-10, C-1, App. D).  According to

the ITC, this data demonstrated that "nonsubject import competition was no less a factor

in the U.S. market than subject imports." *Id.* at 27.  For example, the only significant

decrease in the domestic industry's operating income and operating income margin

occurred between interim 2011 and interim 2012, when subject imports lost market

share to nonsubject imports, and not the domestic industry. *Id.* (citing *Staff Report* at

Tables IV-10, V-I).  The ITC thus concluded that the significant presence of competitive

nonsubject imports in the U.S. market undermined the possibility of a link between subject imports and the domestic industry's performance.  *Id.* at 26.

On the basis of this analysis, the Commission determined that the domestic industry's improved performance during the POI stemmed from the economic collapse in 2009 and the subsequent, albeit tepid, recovery.  *Id.* at 27.  The presence of subject imports, by contrast, "did not significantly impede the domestic industry's progress."  *Id.*

In their comments on the *Remand Views*, Plaintiffs criticize the Commission's business cycle analysis.  They do not, however, articulate a challenge to the Commission's methodology or contend, with any specificity, that the agency's determination is not supported by substantial evidence.  (*See, e.g.*, Comments at 9-10, 16.)  Rather, it appears that Plaintiffs simply do not like the result of the Commission's analysis.

The court finds that the Commission satisfactorily accounted for the effects of the business cycle on the domestic industry's performance.  The ITC's analysis cites to substantial evidence supporting its analysis of the effects of the business cycle as distinct from those of subject imports on the domestic industry.  By doing so, the Commission "explain[ed] how it has evaluated the impact of subject imports on the domestic industry within the context of the business cycle," as the court ordered in *JMC I*, 38 CIT at __, 24 F. Supp. 3d at 1321, and fulfilled the requirements of 19 U.S.C. § 1677(7)(C)(iii).  *See Hynix Semiconductor, Inc.*, 30 CIT at 1226-27, 431 F. Supp. 2d at 1344 (noting that business cycle analysis aims to ensure that positive business cycle trends do not mask unfair trading practices).  While Plaintiffs might prefer that the

Commission had undertaken a different type of analysis with regard to the business

cycle, the question is whether the Commission's methodology was reasonable, not

whether it was the preferred methodology of Plaintiffs.  *Shandong TTCA Biochemistry*

*Co.*, 35 CIT at __, 774 F. Supp. 2d at 1329.  The Commission's business cycle analysis

complied with the court's remand order and the statute; accordingly, the analysis is

sustained.

### C.  Plaintiffs' Other Arguments

#### 1.  The Impact of Product Fungibility on the Commission's Volume Analysis

Plaintiffs maintain that the Commission has an obligation to explain "why the

negative volume impact of subject imports alone was not sufficient to require an

affirmative determination under the statutory definition of material injury."  (Comments at

4, 9-10.)  They argue that the fungibility of subject imports with the domestic like product

ensures that an increase in subject import volumes "would likely be in substantial part"

at the expense of the domestic industry, particularly its share of the U.S. market.

(Comments at 6-8 & n.8.)  Plaintiffs therefore aver that the increase in the volume of

subject imports during the POI necessitates that the ITC "identif[y] the other evidence

that nullifies the significance of fungibility so as to support a negative determination."

(Comments at 6.)

Plaintiffs already have raised, (*see* ECF No. 71 at 13), and the court rejected, the

argument that the fungibility of subject imports and the domestic like product, in

conjunction with the increased volume of subject imports during the POI, necessitate a

negative injury determination or further explanation by the Commission.  *JMC I*, 38 CIT

at __, 24 F. Supp. 3d at 1298-99.  The court will not reconsider these issues here.  *Kori*

*Corp. v. Wilco Marsh Buggies & Draglines, Inc.*, 761 F.2d 649, 657 (Fed. Cir. 1985)

("The law of the case doctrine is that courts should generally refuse to reopen what has

been decided.") (citation and quotation marks omitted).  While the court provided that

the ITC could have reconsidered this issue on remand to the extent that its prior

consideration "relied upon or took into consideration [its] prior findings" on the business

cycle or lost sales and revenue issues, *JMC I*, 38 CIT at __, 24 F. Supp. 3d at 1305, the

Commission was not required to reconsider the issue and Plaintiffs' arguments do not

suggest otherwise.

### 2.  The Correlation Between Subject Imports and the Domestic Industry's Financial Performance

Plaintiffs argue that the Commission's correlation analyses of the effects of

subject import volume and prices, and the financial performance of the domestic

industry, are erroneous because the ITC ignored record evidence that indicated the

contrary.  (Comments at 13-25.)

In *JMC I*, the court affirmed the Commission's findings of no correlation between

subject import volume and the domestic industry's financial performance, and subject

import prices and the domestic industry's financial performance.  38 CIT at __, 24 F.

Supp. 3d at 1302-03, 1309-11.  Plaintiffs' arguments do not suggest that the

Commission was required to reconsider these findings on remand and, therefore, the

court will not reconsider them.  *Kori Corp.*, 761 F.2d at 657.

## Conclusion

For the reasons provided above, the court sustains the ITC's remand results.  A

judgment follows.

/s/      Mark A. Barnett
Mark A. Barnett, Judge

Dated: May 29, 2015
        New York, New York